Roy SCHATT, Plaintiff,

v.

**CURTIS MANAGEMENT GROUP, INC.;**
James Dean Foundation Trust, et
al., Defendants.

No. 91 Civ. 1098 (WCC).

United States District Court,
S.D. New York.

May 22, 1991.

904

Bressler & Bressler, New York City (Martin Bressler, of counsel), for plaintiff.

Klineman, Rose, Wolf and Wallack, Indianapolis, Ind. (Dean T. Barnhard, of counsel), and Bower & Gardner, New York City (Laurence M. Shanahan and Alan G. Katz, of counsel), for Curtis Management Group, Inc.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

Photographer Roy Schatt ("Schatt") brings this action [1] for damages and injunctive relief against defendants Curtis Management Group, Inc. ("Curtis"); the James Dean Foundation Trust (the "Foundation"); Advanced Graphics, Inc. ("Advanced"); Culture Shock Ltd. ("Culture"); and At–a–Boy based upon claims of copyright infringement, a violation of 15 U.S.C. § 1125(a) (the "Lanham Act"), and the New York's Artists' Authorship Rights Act, N.Y. Cultural Affairs Law Section 14.03 (the "Cultural Affairs Law").[2] Plaintiff

1. On February 14, 1991, plaintiff brought a related action, filed as 91 Civ. 1098, in which he asserts a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The related action names Curtis Management Group, Inc., James Dean Foundation Trust, and Mark Roesler, the President and Chief Operating Officer of defendant Curtis, as defendants. The disposition of issues now before the Court on defendants' motion and plaintiff's cross-motion shall apply equally to plaintiff's original action in this Court and the related action filed subsequently.

2. The defendants against whom plaintiff initially brought this action included the following: Curtis Management Group, Inc.; Athena International; HBL Limited; Temlex, Inc.; The Sharper Image; Advanced Graphics, Inc.; Culture Shock, Ltd; Scandecor International AB; and Scandecor, Inc. Since filing his initial complaint on October 2, 1990, plaintiff has voluntarily withdrawn his claims with prejudice and without costs as against a number of the original defendants and has named additional parties as defendants in succeeding amended complaints. Plaintiff's third amended complaint in this matter was filed on February 4, 1991. On May 7, 1991, plaintiff withdrew his claims under the Universal Copyright Convention and Berne Convention with prejudice. As such, the

also asserts a common law claim in tort against defendants for their alleged misrepresentations to licensees of defendant Curtis respecting the right of publicity in Dean. Defendants interpose a counterclaim in their answer to plaintiff's third amended complaint alleging that plaintiff fraudulently held himself out as the proprietor of all rights in and to the photographs of James Dean and thereby unjustly enriched himself at their expense. Defendants request declaratory and injunctive relief and demand the imposition of punitive damages for plaintiff's actions. Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1338(a), 1338(b), 15 U.S.C. § 1121, and personal jurisdiction of defendants is alleged under New York's "long-arm" statute, Section 302 of the New York Civil Practice Law and Rules.

This action is presently before the Court on defendants' motion for partial summary judgment pursuant to Rule 56(c), Fed.R. Civ.P. on plaintiff's claims brought under the Copyright Laws and the Cultural Affairs Law. The Court also considers plaintiff's cross-motion for partial summary judgment pursuant to Rule 56(c) on his claim under the Lanham Act and his related motion to strike defendants' counterclaim under Rule 12(b)(6).

The Court's consideration of the aforementioned motions follows a two-day hearing held on December 10–11, 1990 on plaintiff's motion for a preliminary injunction whereby he sought to enjoin defendants from licensing or disseminating products which allegedly incorporate reproductions of plaintiff's photographs of James Dean. The two-day hearing was terminated by the Court with the consent of the parties so that an expedited trial could be held on the merits beginning June 10, 1991.

## BACKGROUND

Plaintiff Roy Schatt is a well-known New York photographer, some of whose photographs have become widely recognized. A book of his photographs of the late actor James Dean ("Dean") was published in 1982 entitled *JAMES DEAN: A POR-TRAIT* (the "Book"). Copyright protection in the Book and in all of the illustrations therein was obtained in plaintiff's name on August 23, 1982. The photographs were taken of Dean during a nine-month period beginning in 1954 when Dean was a photography student of Schatt. A collection of these photographs later became known as the "torn sweater" series for their distinctive character and poses. A number of the photographs appearing in the Book were taken by Dean himself while he was under the tutelage of plaintiff. These photographs are identified accordingly in the Book.

The Foundation, formed by Dean's heirs to safeguard and market the right of publicity in the late actor, operates through its agent, defendant Curtis, to market the name, voice, signature, photograph and likeness of James Dean throughout the world. Beginning sometime after 1985, the Foundation, through Curtis, entered into licensing agreements with a number of third parties for the purpose of marketing its professed right of publicity in James Dean.[3] The list of licensees included defendants Advanced, a California poster manufacturer; Culture, a London-based publisher and distributor of calendars; and At–a–Boy, a California manufacturer of wall magnets. Pursuant to their agreements, defendant licensees manufactured products which incorporated reproductions of one or more of plaintiff's photographs of Dean.

Court does not pass judgment on the propriety of such claims nor the related issues of law raised by defendants in their motion for summary judgment.

**3.** As part of the licensing arrangement, the licensees warranted that they would affix their manufactured products with an agreed upon copyright notice recognizing defendant Curtis as the authorized licensing entity. Defendant Curtis and the Foundation required that the licen-

sees submit finished samples of their products to defendant Curtis for approval prior to their public distribution or sale. The licensing agreements did not absolve the licensees of "... [their] responsibility, if any, to procure legally sufficient permission from the copyright owner(s) of the photographs ... utilized in conjunction with the manufacture and distribution of the goods ..." Answer, ¶ 25.

Answer, ¶ 21. The posters, calendars, and magnets produced by defendants were in some instances altered copies of plaintiff's original work. In no case was plaintiff acknowledged as the originator of the photographs. Plaintiff claims that in the summer of 1990, he first noticed that many of his photographs of Dean which appeared in the Book were being reproduced without permission and without attribution by defendants pursuant to the arrangements described above. Virtually all of these reproductions carried a notice of copyright in the name of the Foundation and acknowledged "Curtis Management Group" as the licensing agent. Plaintiff's Memorandum, at 2. This lawsuit was initiated soon thereafter.

## DISCUSSION

### A. SUMMARY JUDGMENT

*The Standard for Summary Judgment*

█ A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*, 804 F.2d at 11. The inquiry under a motion for summary judgment is thus the same as that under a motion for a directed verdict: "whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

**(1)** *Defendants' Motion for Summary Judgment on Claims Brought under the Copyright Laws and the Cultural Affairs Law.*

**(a)** *Schatt's standing to sue.*

Defendants argue that all possessory and proprietary interests in the photographs at issue, including common-law copyrights and the rights to obtain statutory copyrights, belong to *Life* magazine by reason of plaintiff's dealings with the publication. Alternatively, defendants argue that such rights vested in James Dean as the subject of the photographs. In either scenario, defendants conclude that plaintiff has no standing to bring this lawsuit.[4] In support of their claim, defendants draw the Court's attention to the holding in *Lumiere v. Robertson–Cole Distributing Corp.*, 280 F. 550 (2d Cir.1922), *cert. denied*, 259 U.S. 583, 42 S.Ct. 586, 66 L.Ed. 1075 (1922) in which a photographer was denied any right of copyright in photographs he had taken because a third party had engaged the services of the photographer on behalf of the subject and the photographer was paid for the photographs and his services in taking them.

█ Defendants' effort to apply the holding in *Lumiere* to the facts here is at best premature. The Court recognizes the general principle that where a party commissions specific work by a photographer, the right to the copyright in the underlying photographs resides with the commissioning party. *Lumiere*, at 553. However, the preliminary issue of whether *Life* magazine commissioned the photographs or paid Schatt a fee for a "first look" at plaintiff's work remains a triable question of fact

---

**4.** In opposition to defendants' assertions, plaintiff alleges to have acquired from Warner Brothers, Inc. ("Warner"), through an assignment dated February 11, 1991, the rights of publicity in

all photographic "poses" of James Dean that Dean had contractually made available to *Life* magazine on April 7, 1954 and that now appear in the Book.

that must be resolved before the holding in *Lumiere* may be applied here.[5]

■ Similarly, the factual discrepancies surrounding James Dean's dealings with plaintiff must be reconciled before the Court can consider the applicability of the principle that where a subject comes to a photographer and induces the creation of photographs, the right of copyright "is in the sitter . . . and it is not in the photographer." *Lumiere*, 280 F. at 553. The Court has yet to resolve the factual ambiguity surrounding the relationship between Roy Schatt and James Dean. It is not clear that Schatt and Dean's interaction in the 1950s evidenced a photographer/customer relationship rather than some less formal interchange. This issue remains contested and cannot be resolved on defendants' motion for summary judgment.

(b) *Abandonment or forfeiture of Schatt's claim to copyright.*

Having denied defendant's preliminary challenge to plaintiff's standing to sue, the Court turns to defendants' claim that to the extent plaintiff ever had enforceable copyrights in the subject photographs, they have been abandoned due to failure to enforce or forfeited due to failure to renew.

(1) *Abandonment.*

■ Defendants assert that plaintiff's conduct and testimony compel a holding that plaintiff has "abandoned" his copyright in the James Dean photographs. The "abandonment" of a copyright, as distinguished from its "forfeiture", turns on the state of mind of the copyright proprietor and will occur whenever he engages in "some overt act which manifests his purpose to surrender his rights in the work and to allow the public to copy it." *National Comics Publications, Inc. v. Fawcett Publications, Inc.*, 191 F.2d 594, 598 (2nd Cir.1951). Here, defendants claim to find in plaintiff's testimony a revelation of "... his own subjective intention to abandon any rights to his photographs of James Dean." Defendants' Memorandum, at 18.

■ Defendants contend that plaintiff's acquiescence and inaction in the face of wide circulation of copies of his photographs evidence his intent to abandon any claim to copyright. *Stuff v. E.C. Publications, Inc.*, 342 F.2d 143 (2d Cir.1965).[6] To support their assertion, defendants ask the Court to find that plaintiff had constructive knowledge, if not actual knowledge, of the widespread dissemination of his photographs among various fan magazines and other popular publications and that his failure to take action in defense of his alleged copyright is tantamount to abandonment. Defendants assert that where the infringer's conduct has been open and the alleged proprietary owner of the copyright offers no justification for his ignorance, abandonment must be presumed.[7] Defendants' Memorandum, at 24.

---

**5.** The Court does not share defendants' conclusion that plaintiff's testimony and prior writings "unequivocally" prove that Schatt was hired as an independent contractor by *Life Magazine*. Plaintiff's introduction of an invoice dated January 11, 1955 which plaintiff provided to *Life Magazine* for "holding photos of James Dean" suggests that plaintiff offered the magazine an option to use the photographs and was not commissioned by *Life Magazine* as defendants conclude. Plaintiff's Memorandum, at 2. While the Court does not endeavor to resolve disputed issues of fact here, it does recognize the conflicting evidence presented as an indication of a "... sufficient disagreement to require submission to a jury ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 251, 106 S.Ct. at 2512.

**6.** The Court questions defendants' reliance on *Stuff* given the facts now before the Court. As plaintiff points out, the Court in *Stuff* had before it a claim for copyright infringement

brought by a plaintiff who was found to have acquiesced in the publication of 2,000 copies of his work without notice of copyright. The Court there held that the work was thrust into the public domain because of the size of the distribution which, without question, is far greater than even the most generous estimate of the number of copies of plaintiff's work disseminated here.

**7.** The Court does not find it so unreasonable or contradictory for plaintiff, in professing his ignorance to the wide dissemination of his photographs, to have testified that "... he read *New Yorker* magazine [and] *Life* magazine, but swore unfamiliarity with *Modern Screen, Screen Stories, Photoplay* and *Rave*" and therefore had no knowledge of the latter magazines' publication of his photographs. Similarly, plaintiff's reference to an "underground" circulation of his work that allegedly served as a source for an

In opposition, plaintiff provides the Court with evidence of actions undertaken which are inconsistent with an intention to abandon, including actions by both plaintiff and his wife aimed at stopping the unauthorized use of plaintiff's Dean photographs. While the aggregate of this evidence may fail in the end to overcome the weight of defendants' evidence of plaintiff's alleged abandonment, it is sufficient to stave off summary judgment here.

### (2) *Forfeiture.*

Defendants next argue that even if plaintiff did not abandon his copyright in the photographs, his failure to renew his statutory copyright constitutes a forfeiture. Notwithstanding plaintiff's protestations that he never authorized a publication of his photographs, defendants offer the Court seven scenarios upon which the Court may fix a date of investitive publication and thus determine the date of public divestiture. The year of "publication"[8] is dispositive here because if plaintiff published his photographs prior to 1962, any statutory copyrights pertaining thereto would have lapsed due to his failure to file for a renewal of the original twenty-eight year term as is required by 17 U.S.C. § 304(a).[9]

The factual predicates upon which defendants rely for fixing a date of investitive publication include: (a) plaintiff's dealings with *Life* magazine; (b) *Movie Life*'s acquisition of the right to publish one or more of plaintiff's James Dean photographs; (c) *Modern Screen*'s publication of some of plaintiff's works; (d) the alleged testimony of plaintiff's agent that plaintiff had told her that he had "published" his works in 1954; (e) the use of "1955" as the date of publication by plaintiff's licensees on post-

cards allegedly published in 1987 to 1989; and (f) plaintiff's sale of his photographs to fans of James Dean prior to January 1, 1962. Plaintiff's Memorandum, at 43. The Court will treat defendants' assertions seriatim.

#### (a) *Life* magazine acquisition.

■ As for defendants' claim that plaintiff's offer to "make available" his photographs to *Life* magazine constituted a "publication" in 1954, defendants rely on the holding in *Brown v. Tabb*, 714 F.2d 1088 (11th Cir.1983) to support their proposition that one copy of an artist's work made available to one member of the general public is sufficient to constitute legal publication. Defendants' Memorandum, at 33. The Court is not persuaded. Instead, the Court finds more authoritative Nimmer's comment on this issue based on citations of *Press Publishing Co., v. Monroe*, 73 F. 196 (2d Cir.1896); *Peter Pan Fabrics, Inc. v. Dan River Mills, Inc.*, 295 F.Supp. 1366 (S.D.N.Y.1969) *aff'd* 415 F.2d 1007 (2d Cir.1969):

> If an author grants to another the right to publish his work, the grant does not in and of itself constitute a publication unless and until the grantee exercises that right. Furthermore, publication does not result from mere delivery of the manuscript of a work to a publisher, even if delivery is made for the purpose of having the work printed so that it may become available to the public.

1 Nimmer § 4.04. Accordingly, the Court concludes that plaintiff's delivery of his photographs to *Life*, whether pursuant to a commission or for purposes of offering the publication a "first look", would not consti-

---

array of fan magazines makes plaintiff's "ignorance" of such publication more credible and sufficiently rebuts defendants' assertion that no triable issues of fact remain.

**8.** The current Copyright Act contains the following definition of "publication":
> ... the distribution of copies ... of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies ... to a group of persons ... [for] ... further distribution, ...

17 U.S.C. § 101. Nimmer notes that while this definition was not contained in the 1909 Act, the

above "constitutes a codification of the definition evolved by case law prior to adoption of the present Act." 1 Nimmer § 4.04.

**9.** Because the alleged publication of plaintiff's work occurred prior to January 1, 1962, the Copyright Act of 1909 controls here. Under that regime, once an artist chose to make available his work for general publication, the common-law protection of his endeavors was lost and the artist could then protect his work only if he observed the requirements of the Copyright Act, to wit: publication with notice, registration and timely renewal. *See* 1 Nimmer § 4.03.

tute a general investitive publication which would start the twenty-eight year renewal clock absent *Life*'s publication thereof.

### (b) *Movie Life* Acquisition.

■ Defendants next contend that the twenty-eight year renewal period commenced on December 28, 1955, the date he made his photograph of James Dean available to the magazine *Movie Life* for publication in its March 1956 issue.[10] By establishing 1956 as the base year of plaintiff's investitive publication of his work under 17 U.S.C. § 304(a), defendants urge the Court to decide, as a matter of law, that plaintiff's failure to renew his copyright by 1984, at the latest, constitutes a forfeiture.

Plaintiff does not contest defendants' assertion that he gave permission to *Movie Life* to use a single photograph. Nor does plaintiff contest the significance of the invoice of December 28, 1955. To counter defendants' forfeiture argument, plaintiff explains that because he granted permission to the magazine to use one of his Dean photographs in the March 1956 issue of *Movie Life* and it was not used until October 1956, "... it is not unreasonable to maintain that plaintiff did not grant consent to use the James Dean photo in October 1956." Plaintiff does not offer the Court any legal precedent for this assertion and treats these uncontested facts with surprising brevity in its memorandum. Having conducted its own extensive review of the law on this topic, the Court finds no case law to support plaintiff's contention.

In light of the foregoing, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim of copyright infringement as it relates to plaintiff's one photograph of James Dean published in the October 1956 issue of *Movie Life*. Plaintiff's Exhibit 16. As a matter of law, such publication divested plaintiff of any residual common law copyright in that photograph and constituted an investitive publication thereby providing plaintiff with statutory protection of his copyright for the ensuing term of twenty-eight years.

When such proprietary right was not renewed at the appropriate time, the photograph passed into the public domain.

Accordingly, defendants' summary judgment motion is granted only as to plaintiff's copyright claim based upon plaintiff's photograph of James Dean appearing in the March 1956 issue of *Movie Life*. This grant of partial summary judgment does not affect any other issues.

### (c) *Modern Screen* Publication.

■ With regard to defendants' comments about the appearance of plaintiff's photographs in *Modern Screen*, plaintiff argues that because such publication was unauthorized it does not constitute a "publication date" upon which the statutory period of renewal is to be computed. Plaintiff draws the Court's attention to section 26 of the Copyright Act of 1909 which reads,

> In the interpretation and construction of this title "the date of publication" shall in the case of a work of which copies are reproduced for sale or distribution be held to be the earliest date when copies of the first authorized edition were placed on sale, sold, or publicly distributed *by the proprietor of the copyright or under his authority* ...

Copyright Act of 1909, § 26 (Emphasis added). Defendant does not challenge this contention. Therefore, the Court does not impute any date of publication on the basis of the photographs appearing in *Modern Screen*.

### (d) Testimony of Plaintiff's Agent.

■ Defendants' contention that plaintiff admitted through his agent, Alexandra Rose, that his photographs were "published" with his authorization in 1954 is based on what the Court perceives to be defendants' misrepresentation of Ms. Rose's comments at her deposition. Ms. Rose's testimony on December 4, 1990 suggests that plaintiff informed her that he "recalled" photographs of his appearing in publications in 1954, not that he gave authorization for such publication. With ref-

---

**10.** Defendant offers the Court plaintiff's invoice of that date to demonstrate the magazine's ac-

quisition of the right to publish plaintiff's photograph(s) for $50.00.

erence to advertisements placed by National Westminster Bank in 1982 in which plaintiff's photographs appeared, Ms. Rose clarified her prior characterization of what plaintiff thought to be the truth about the 1954 publication of his photographs,

> ... I have to elucidate here. When I originally asked him ... he just knew that something had been published. So I asked him when and he said 1954. But then I found out ... it was erroneous because he never did it with permission ... it appeared somewhere in '54. At that time lots of publications appeared with James Dean.

Alexandra Rose Deposition, at 48. On the basis of Ms. Rose's recollection of plaintiff's ambiguous statement, the Court is unable to fix a date of publication which would *trigger* the twenty-eight year renewal period and produce a forfeiture of plaintiff's statutory copyright.

### (e) The use of 1955 as date of publication on licensee's postcards.

Defendants contend that plaintiff's reference to a "[x]erox copy of photographic image of Roy Schatt C [copyrighted] 1955" in his letter of July 6, 1988 to Ludlow Sales regarding the marketing of James Dean postcards constitutes an "admission" that the photograph was "published" in 1955, or alternatively, must be treated by the Court as the date upon which publication was in fact undertaken by plaintiff. Plaintiff counters the "admission" argument by referring the Court to his affidavit in which he confuses the date of publication with the date of creation. Plaintiff also relies upon a letter which plaintiff's wife sent to Ludlow Sales on May 3, 1990 in which she stated:

> I don't know whose mistake it was by putting the C with the years 1954/55; however, I've mentioned this to Bob [Ludlow Sales] on the telephone and he agreed that these would be changed to read C 1982 as our copyright commences from the time of publication of our book

and not from the time the photograph was taken.

Plaintiff's Exhibit "V".

Plaintiff's evidence of his own confusion and of his wife's efforts to correct an asserted error in the copyright notice affixed to the postcards are sufficient to defeat defendants' motion insofar as it is based upon plaintiff's alleged admission of the publication date.

However, the Court concurs with defendants' alternative contention that, as a matter of law, the date given in the copyright notice determines the base year from which the twenty-eight year renewal period is computed. The Court agrees that the copyright owner cannot escape the legal consequences of an antedated copyright notice on the duration of the copyright. *See American Code Co. v. Bensinger*, 282 F. 829, 836 (2d Cir.1922). The Court cannot accept plaintiff's argument that the erroneous date is mere "surplusage." [11] In the House Report on 17 U.S.C. § 406(b), Congress clearly stated otherwise:

> In the case of an antedated notice, where the year in the notice is earlier than the year of first publication, the bill adopts the established judicial principle that any statutory term measured from the year of publication will be computed from the year given in the notice.

H.Rep., p. 149; *see also Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.*, 161 F.2d 406 (2d Cir.1946) (the original term of copyright was regarded as terminating on December 31st of the 28th year following the year stated in the notice).

While defendants have satisfied the Court that, as a matter of law, they are entitled to judgment as to any photographs which were published, with plaintiff's authorization, with a copyright notice dated "1955", their motion for summary judgment on that ground must fail because defendants' papers do not identify the specific photographs involved.

---

**11.** Plaintiff's reference to *Leigh v. Gerber*, 86 F.Supp. 320, 322 (S.D.N.Y.1949) on the issue of "surplusage" is not persuasive. In that case, the Court ruled that, an elective antedate controls duration, whether "surplusage" or not.

(f) Plaintiff's sale of his photographs to fans of James Dean.

Defendants claim that plaintiff's distribution of "hundreds" of his James Dean photographs to individual fans who visited his studio "... soon after [Dean's] death," constituted a general investitive publication of his work in 1955 and 1956. Defendants Memorandum, at 35. Plaintiff counters by arguing that only 35 to 50 people came to plaintiff's studio to view his James Dean photographs between 1955 and 1962, and that the sale of only one print through 1962 amounts to a limited distribution upon which no investitive date of publication should be fixed. Referring the Court to an affidavit of a purchaser of one of his photographs, plaintiff suggests that because he limited the sale of his photographs to those individuals that passed his subjective "test of cordiality", as defendants label it, no inference of publication can be drawn.[12]

■ Plaintiff admits having sold, prior to 1962, at least one James Dean photograph bearing a "... circle with a C in the middle and the date ... and ... Roy Schatt ..." Transcript, p. 71. Plaintiff's argument that this did not constitute an investitive publication under the Copyright Act of 1909 is not persuasive. The Court concludes that because plaintiff elected to proceed by sale with a copyright notice, his claim to copyright must be measured from the year stated in the notice. Any common-law copyright plaintiff claimed thereto was divested as of the date of publication with notice.[13]

■ However, while the Court agrees with defendants' contention as to the applicable law on this point, defendants have again left the Court without the necessary evidence to determine *which* photographs were distributed with a copyright notice prior to 1962 and accordingly must deny this portion of defendants' motion.

(c) *New York Cultural Affairs Law.*[14]

■ The New York Cultural Affairs Law was enacted to protect an artist's rep-

---

12. Plaintiff's assertion that copies of his work must have been made available to "all comers and not only to a class" in order for the dissemination of the photographs to have been a general publication is not convincing. Plaintiff's reliance on the holding in *White v. Kimmell,* 94 F.Supp. 502 (S.D.Cal.1950), *rev'd* 193 F.2d 744 (9th Cir.1952), for which he incorrectly cites the disposition of the case, is misguided. The Court of Appeals for the Ninth Circuit *reversed* the District Court's ruling in *White* and concluded that the distribution of the author's manuscript to "friends" constituted a *general* and not a *limited* publication to the extent the recipients were permitted to pass the manuscript on to selected "others." 193 F.2d at 745. As is the case here where plaintiff sold his prints to congenial strangers, the Court in *White* was "... unable to see in this picture any definitely selected individuals or any limited, ascertained group or class to whom the communication was restricted." 193 F.2d at 747. Plaintiff's arbitrary test of those fans "worthy" of the opportunity to purchase his work could not have sufficiently limited the scope of his publication to avoid investitive effect.

13. The Seventh Circuit ruled on the issue of limited publication and the interplay between a party's publication with notice and any residual claim to common-law copyright protection:

[A] "limited publication" is really in the eyes of the law no publication at all. Without publication, under the 1909 Act the statutory durational limitations would not start to run.

As long as there was no publication, a common law copyright of unlimited duration would be available. Furthermore, statutory copyright limitations would continue to be available to plaintiff at any time plaintiff decided to publish with notice, the time of statutory protection only then starting to run. If the acts plaintiff admits to effected this result, plaintiff has its cake and eats it too. This would be inconsistent with once of the principles at the heart of copyright law, "... [i]n order to induce the author to disclose his work to the public notwithstanding the resulting loss of his common law protection, the statute substitutes new rights, albeit limited in time." A. Latman, The Copyright Law: Howell's Copyright Law Revisited 112 (5th ed. 1979). We conclude that the concept of "limited publication" is not here applicable.

*Data Cash Systems, Inc. v. JS & A Group, Inc.* 628 F.2d 1038, 1043 (7th Cir.1980). Based upon the foregoing, this Court concludes that once plaintiff published a particular photograph with notice, he divested himself of any common-law copyright therein and thus retained the durationally limited statutory protection of the copyright laws subject to renewal at the appropriate time.

14. As a seventh affirmative defense, defendants argue that plaintiff's claims under Section 14.03 of the Arts and Cultural Affairs Law are preempted by 17 U.S.C. § 301 and must therefore be dismissed. Defendants have not incor-

utation from the attribution to him of altered, defaced, mutilated or modified works of art. N.Y.Arts & Cult.Aff.Law § 14.03 (McKinney's Supp.1991)[15]; *see* Damich, *The New York Artists' Authorship Rights Act: A Comparative Critique*, 84 Colum. L.Rev. 1734, 1738–39 (1984). In his complaint, plaintiff claims that defendants' conduct violated § 14.03 in that he was deprived of his right to disclaim authorship to defendants' altered reproduction of his photographs and that

... the alterations, distortions, mutilations and modifications of his [plaintiff's] work by defendants, is reasonably likely to result in damage to his reputation in violation of his rights under the statute.

Complaint, ¶ 79.

Defendants argue that because Schatt authorized unlimited numbers of copies of the Schatt/Dean photographs, Section 14.-03 of the Arts and Cultural Affairs Law, which applies only to "limited" editions of "not more than three hundred copies," is inapplicable on its face. In support of this proposition, defendants direct the Court's attention to plaintiff's testimony at the hearing in which, they contend, he admitted to having never considered his photographs to be "limited editions."[16] The referenced colloquy went as follows:

THE COURT: In other words, you didn't have a finite supply of prints; you *could* make additional prints from the negatives if you wanted to? [Emphasis added]

WITNESS: The negative's always there, sure.

THE COURT: It wasn't as if you had a limited number and as soon as they were sold that would be the end of it?

WITNESS: You got it. You're absolutely right, Judge.

After carefully reviewing this testimony in the context of the entire proceedings, the Court disagrees with defendants' conclusion. The exchange between the Court and

porated such argument in their papers in support of their motion for summary judgment now before the Court. Because the Court has ruled in a prior matter that Section 14.03 of the Arts and Cultural Affairs Law is not preempted by 17 U.S.C. § 301, *see Wojnarowicz v. American Family Association*, 745 F.Supp. 130 (S.D.N.Y.1990) (WCC), the Court now considers only the applicability of the New York Cultural Affairs Law in the instant case.

**15.** New York's Artists' Authorship Rights Act, N.Y.Arts & Cul.Aff.Law § 14.03 (McKinney's Supp.1991), provides, in relevant part, that:

1. [N]o person other than the artist or a person acting with the artist's consent shall knowingly display in a place accessible to the public or publish a work of fine art or limited edition multiple of not more than three hundred copies by that artist or a reproduction thereof in an altered, defaced, mutilated or modified form if the work is displayed, published or reproduced as being the work of the artist, or under circumstances under which it would reasonably be regarded as being the work of the artist, and damage to the artist's reputation is reasonably likely to result therefrom....

2. (a) [T]he artist shall retain at all times the right to claim authorship, or, for just and valid reason, to disclaim authorship of such work. The right to claim authorship shall include the right of the artist to have his or her name appear on or in connection with such work as the artist. The right to disclaim authorship shall include the right of the artist to prevent his or her name from appearing on or in connection with such work as the artist. Just and valid reason for disclaiming authorship shall include that the work has been altered, defaced, mutilated or modified other than by the artist, without the artist's consent, and damage to the artist's reputation is reasonably likely to result or has resulted therefrom.

2. (b) The rights created by this subdivision shall exist in addition to any other rights and duties which may now or in the future be applicable.

3. (e) The provisions of this section shall apply only to works of fine art or limited edition multiples of not more than three hundred copies knowingly displayed in a place accessible to the public, published or reproduced in this state.

4. (a) An artist aggrieved under subdivision one or subdivision two of this section shall have a cause of action for legal and injunctive relief.

**16.** New York's Artists' Authorship Rights Act, N.Y.Arts & Cult.Aff.Law § 11.01(10) (McKinney's Supp.1991), provides for the following definition:

"Limited edition" means works of art produced from a master, all of which are the same image and bear numbers or other markings to denote the limited production thereof to a stated maximum number of multiples, or are otherwise held out as limited to a maximum number of multiples.

plaintiff constitutes only plaintiff's admission that he *could* make additional prints from the negatives, not that he *did*. Plaintiff was apparently commenting about the potentiality of photographic reproduction rather than stating how many prints of any particular James Dean photograph he actually produced from the negative.

Whatever plaintiff's intentions, defendants argue that plaintiff in fact distributed copies of his work far in excess of the statutory limit. The Court does not disagree with defendants' claim that the statute is only applicable in situations where a multiple [17] of less than 300 copies of the disputed work have been produced. However, triable issues of fact remain. Plaintiff alleges that only 25 prints of James Dean photographs were sold through 1980, while defendants allege that "hundreds of thousands" of copies of the photographs have been made. This dispute of fact obviously renders summary judgment inappropriate.

(2) *Plaintiff's Cross-Motion for Summary Judgment on His Claim Under the Lanham Act.*

Section 43(a) of the Lanham Act permits a suit to be brought "by any person who believes that he or she is likely to be damaged" by the use of any false description or representation concerning the origin or quality of goods or services in commerce. 15 U.S.C. § 1125(a).[18] The Lanham Act, as construed in *Benson v. Paul Winley Record Sales Corp.*, 452 F.Supp. 516 (S.D.

N.Y.1978) and *Landon v. Twentieth Century-Fox Film Corp.*, 384 F.Supp. 450 (S.D.N.Y.1974), is designed not only to protect the public and the artist from misrepresentations of the artist's contribution to a finished work, but also to vindicate "the author's personal right to prevent the presentation of his work to the public in a distorted form." *Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 24 (2d Cir.1976).

Plaintiff makes two arguments in support of his claim under the Act. First, plaintiff argues that defendants' use of the "Foundation's name as copyright proprietor of plaintiff's works, as well as their failure to credit plaintiff as photographer of the works reproduced, constitute a false description or representation of plaintiff's works tending falsely to describe or represent them." Complaint, ¶ 73. Second, plaintiff claims that defendants "utilized [the Curtis] name upon plaintiff's goods as the copyright proprietor thereof knowing that such description or representation was false."

Defendants challenge the validity of plaintiff's claim under the Act, contending that, absent an affirmative attribution of their reproductions of plaintiff's work to plaintiff, ". . . Schatt cannot state a cause of action for reputational damage caused by third parties' preparation and marketing of items derived from photographs to which Schatt's copyright claims have been terminated." Defendants' Memorandum, at 2. Defendants further assert that plain-

---

**17.** N.Y.Arts & Cult.Aff.Law § 11.01(19) defines "multiples" as:

> . . . prints, photographs, positive or negative, and similar art objects produced in more than one copy and sold, offered for sale or consigned in, into or from this state for an amount in excess of one hundred dollars exclusive of any frame. Pages or sheets taken from books and magazines and offered for sale or sold as visual art objects shall be included, but books and magazines are excluded.

**18.** Section 43(a) of the Lanham Act provides: Any person who, on or in connection with any goods or service, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading descrip-

tion of fact, or false or misleading representation of fact, which—

> (1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

tiff has failed to establish the "likelihood of consumer confusion" necessary for summary judgment.

■ The factual dispute between the parties concerning copyright ownership is enough to defeat plaintiff's cross-motion for summary judgment. In basing his Lanham Act claim at least in part on defendants' alleged misrepresentation of copyright ownership, plaintiff presupposes that the issue of copyright proprietorship has been resolved in his favor. It has not. It is a live issue involving a complex of disputed facts. Moreover, defendants contend that their products demonstrate sufficient originality to sustain a derivative copyright as a matter of law. Defendants' Memorandum at 16. While the Court does not pass judgment on defendants' contention at this point, such an assertion confirms the existence of a "factual issue to be tried." *Knight*, 804 F.2d at 11.

■ As to defendants' challenge to plaintiff's Lanham Act claim on the basis that Schatt retains no proprietary right in the copyright in the photographs, the Court disagrees. Plaintiff's use of the Lanham Act to guard against the presentation of his photographs in a distorted form is not contingent on possession of a copyright therein. "[C]opyright ownership or lack of such ownership is not disposition of the issue of unfair competition under the Lanham Act." *Rosenfeld v. W.B. Saunders, Div. of Harcourt Brace Jovanovich Inc.*, 728 F.Supp. 236, 243 (S.D.N.Y.1990). Thus, although the factual issues preclude summary judgment on plaintiff's motion, defendants' legal attack on the validity of plaintiff's Lanham Act claim must fail.

■ However, defendants raise quite another issue by questioning whether plaintiff's claim under the Lanham Act is being used inappropriately as a makeshift substitute for a failed claim of copyright infringement rather than to remedy a false

designation of origin as contemplated by the statute. That issue is one that cannot be resolved in the context of a summary judgment motion, but must be left for trial. In the absence of an affirmative attribution of defendants' reproduction of plaintiff's photographs to plaintiff himself, the issue will turn on the strength of evidence presented in support of plaintiff's "secondary meaning" argument: that the Dean photographs in question are so associated in the public mind with plaintiff that the distortion of any of the photographs, either with attribution to other artists or without any attribution, is damaging to his reputation and constitutes a violation of the Act.[19]

Even if the Court were to accept plaintiff's contention that such secondary meaning exists, there would still be a disputed factual issue concerning the "likelihood of consumer confusion" resulting from the use of plaintiff's altered photographs in defendants' products. To state a claim for injunctive relief under section 43(a) of the Lanham Act, plaintiff need only establish a "likelihood that an appreciable number of ordinary prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Rosenfeld v. W.B. Saunders*, 728 F.Supp. at 242 (*quoting Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1321 (2d Cir.1987)). However, in order to establish entitlement to damages for unfair competition under section 43(a), plaintiff has the burden of proving actual consumer confusion resulting from the false designation of origin. *PPX Enterprises Inc. v. Audiofidelity Enterprises, Inc.*, 818 F.2d 266, 271 (2d Cir.1987). In that regard, the testimony of Ron Cayen, author of the definitive book on James Dean, is not sufficient to permit a summary resolution of this factual issue.[20]

---

**19.** Although this is an atypical application of the term "secondary meaning", plaintiff contends that his works are "immutably identified with [him]" and thus any adulterated reproduction, particularly those with no attribution whatsoever, would be likely to confuse a person into believing that the distorted product is the work of plaintiff. Plaintiff's Memorandum, at 14.

**20.** Mr. Cayen is obviously not a representative sample of the "marketplace" of consumers capable of being confused by defendants' products.

## B. MOTION TO STRIKE COUNTERCLAIM [21]

### Motion to Dismiss Standard

■ A motion to dismiss for failure to state a claim tests only the sufficiency of a complaint, *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and should not be granted "unless it appears beyond a doubt that the plaintiff [defendant herein] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Anderson v. Coughlin*, 700 F.2d 37, 40 (2d Cir.1983). This rule is equally applicable to a Rule 12(b)(6) motion to dismiss a counterclaim. *Reeves v. American Broadcasting Cos.*, 580 F.Supp. 84, 89 (S.D.N.Y.1983), *aff'd*, 719 F.2d 602 (2d Cir.1983). The likelihood that defendants will prevail in their counterclaim is immaterial, as is the question of whether or not the requested relief is inappropriate, or whether the legal theories have been miscategorized. *See Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 65, 99 S.Ct. 383, 387, 58 L.Ed.2d 292 (1978) (the fact that a complaint requests an improper remedy, rather than the appropriate one, does not require dismissal of a meritorious claim). In considering plaintiff's motion to dismiss under Rule 12(b)(6), the court must accept as true the allegations accompanying the counterclaim and draw all reasonable inferences in favor of the non-moving party.

*See Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686.

■ The counterclaim in this action alleges unjust enrichment.[22] In order to recover for unjust enrichment, defendants must show that: (1) plaintiff was enriched; (2) that such enrichment was at the expense of defendants; and (3) that the circumstances were such that in equity and good conscience, plaintiff should make restitution. *Chase Manhattan Bank (National Asso.) v. Banque Intra, S.A.*, 274 F.Supp. 496, 499 (S.D.N.Y.1967); *see also Miller v. Schloss*, 218 N.Y. 400, 113 N.E. 337 (1916). After reviewing the pleadings, it is apparent to the Court that defendants' counterclaim states a *prima facie* claim for unjust enrichment. Moreover, it is not clear to the Court that defendants cannot ultimately succeed. Accordingly, plaintiff's motion to dismiss defendants' counterclaims pursuant to Rule 12(b)(6) must be denied.

## CONCLUSION

For the reasons stated above, defendants' motion for partial summary judgment is granted in part and denied in part. Plaintiff's cross-motion for partial summary judgment on his claims under the Lanham Act is denied. Plaintiff's motion to strike defendants' counterclaims is denied. The parties are hereby directed to

---

**21.** In considering plaintiff's motion to dismiss defendants' counterclaims under Rule 12(b)(6), the Court focuses exclusively on the face of the pleadings and excludes from its analysis any extraneous material submitted as to the factual merits of defendants' counterclaims. The Court chooses not to convert plaintiff's motion to dismiss into a motion for summary judgment under Rule 56. Plaintiff is incorrect to assume that a Rule 12(b)(6) motion automatically "becomes" one for summary judgment under Rule 56 if affidavits are submitted in support thereof. Such a conversion is left to the discretion of the Court, and where undertaken, the Court is obliged to inform the parties and solicit further briefing on the factual matters at hand. Rule 12, Fed.R.Civ.P.

As to plaintiff's footnote wherein he notes defendants' failure to provide the Court with a statement of facts as required under Local Rule 3(g), the Court notes that Rule 3(g) statement is only required to accompany a motion for summary judgment pursuant to Rule 56 and not a motion to dismiss on the pleadings under Rule 12(b)(6). Plaintiff's affidavit and supporting memoranda clearly indicate that his motion is one to dismiss defendants counterclaims under Rule 12(b)(6).

**22.** Plaintiff's contention that defendants' counterclaim is merely a claim for copyright infringement disguised as an action rooted in principles of equity and common law is not persuasive. Defendants do not allege that "they are the equitable owners of the copyright to the photographs, nor do they allege that Schatt holds the copyright as trustee *ex maleficio*. Rather ... defendants simply seek a declaration as to ownership of certain property and an accounting of proceeds" which they alleged plaintiff obtained unjustly.

appear for trial on June 10, 1991 as scheduled.

SO ORDERED.