**Jerry CHOE, Plaintiff,**

v.

**FORDHAM UNIVERSITY SCHOOL OF LAW, Fordham International Law Journal, Defendants.**

**No. 93 Civ. 5992 (MBM).**

United States District Court, S.D. New York.

July 12, 1995.

Barton Denis Eaton, White Plains, NY, for plaintiff.

David B. Rigney and Edward J. Klaris, Lankenau Kovner & Kurtz, New York City, for Defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiff, Jerry Choe, has sued Fordham University School of Law and Fordham International Law Journal ("ILJ") for their alleged mutilation of his Comment, *Fortino v. Quasar: Parent–Right Invocation for U.S. Subsidiaries of Japanese Companies Under U.S.—Japan Treaty of Friendship, Commerce, and Navigation,* 15 Fordham Int'l L.J. 1130 (1992). He claims defendants violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and his federal common law "moral rights." In addition to these two federal claims, plaintiff asserts five pendent state claims, including libel, breach of contract, negligence, and invasion of his "moral rights" and right to privacy. Both parties have moved for summary judgment. For the reasons given below, defendants' motion is granted, and the complaint is dismissed.

### I.

The following facts are based on affidavits, depositions, and other exhibits. Plaintiff succeeded on his second attempt to gain admission to ILJ, in the Spring of his second year of law school. (Choe Dep. at 10) In either the late Summer or early Fall of his third year, Choe began research on the district court decision *Fortino v. Quasar Co.,* 751 F.Supp. 1306 (N.D.Ill.1990), *rev'd,* 950 F.2d 389 (7th Cir.1991), the case that became the subject of his Comment. (*Id.* at 12) During the school year, plaintiff worked closely with two ILJ editors to develop his Comment. (*Id.* at 16) When plaintiff graduated from law school, his Comment had been through several drafts, and was approved by the graduating editors for publication. (*Id.* at 24) A new board of editors took over the journal, and had responsibility for publishing the volume in which plaintiff's Comment appeared. (*Id.* at 25) However, according to Eileen McCarthy, the then editor-in-chief of ILJ, each author had principal and ultimate responsibility for insuring that the published work was presented in acceptable form. (McCarthy Aff. ¶ 6) Choe averred that the new editors were not only inexperienced text editors but also "had only the sketchiest substantive knowledge of the rather abstruse subject matter of the [Comment]." (Choe Aff. ¶ 4)

After finishing the New York State bar examination on July 29, 1992, plaintiff met with the editor-in-chief and managing editor of ILJ to edit and discuss the second page proofs of his Comment. (Choe Dep. at 28) Plaintiff and the editors worked together for a few hours that afternoon, and all the following day and evening. (*Id.* at 28–29; McCar-

thy Aff. ¶ 7) Although Choe testified that he understood this was his last opportunity to suggest changes before publication (Choe Dep. at 32), he averred later that the editors refused because of time restraints his later request to view the Comment. (Choe Supp. Aff. ¶¶ 11–12) Choe and the editors went over each page of the Comment (Choe Dep. at 30; McCarthy Aff. ¶ 7; McCarthy Supp. Aff. ¶ 4), and Choe corrected each error with red ink on the page proof itself. (Choe Dep. at 30) After making all the necessary corrections, Choe and the editors allegedly shook hands, "reflecting the clear understanding that we were all in agreement on the final review and editing of [Choe's] comment." (McCarthy Aff. ¶ 10) There were no further corrections to the page proof before the Comment was sent to the printer. (McCarthy Supp.Aff. ¶ 5) Choe apparently kept no copies of the corrected proofs. The next day, Choe returned to the ILJ office with an executed grant of license approving the journal's publication of his Comment. (Choe Dep. at 39) In early August, the managing editor sent edited book proofs back to the publisher, which included 24 corrected typographical errors in plaintiff's Comment. (McCarthy Supp.Aff. ¶ 8, Ex. A)

In his continuing effort to find legal employment, plaintiff informed various employers of his soon-to-be published Comment. (Choe Dep. at 41) When Choe read his Comment in print, however, he was horrified to discover numerous alleged substantive and typographical errors. Defendants allegedly presented to the public a "garbled and distorted version of plaintiff [*sic*] work." (Amend.Compl. ¶ 18) Many of the alleged errors were "plain, old-fashioned typos which surely are as much the copy's [*sic*] editors' province [*sic*] as they are the author's (if not moreso [*sic*])." (Choe Aff. ¶ 21(a)) Choe averred that "various of the mutilations occurred on nearly every single page of the [Comment]." (*Id.* ¶ 3)

Several months after the Comment appeared in print, Choe presented his grievances about the Comment to two Fordham law professors. Based on Choe's description of the alleged errors in his Comment, the professors and Choe agreed that ILJ had three options: 1) issue an errata sheet; 2) issue a separate bound reprint to be placed next to the bound volume; 3) republish the corrected Comment in a new issue and send a sticker to be placed on the front page of the original article to all subscribers, alerting them to the reprinted Comment. (Choe Aff. Ex. 4) The professors, and a former editor-in-chief of ILJ, agreed that the third option was best. After actually reading Choe's Comment and his suggested changes several months later, however, both professors changed their minds and suggested instead that the errors be corrected in a reprint, and that an errata sheet be sent to all subscribers. (Vairo Aff. Exs. C, D)

The ILJ Board of Editors agreed to discuss with Choe his allegedly "mangled" Comment. Choe signed an agreement with the Board that he would abide by its decision about what action, if any, it decided to take. (Choe Dep. at 61–64) Choe presented the Board with a copy of his Comment marked with 17 of the "very most [*sic*] egregious substantive errors" in order to "demonstrate their vast extent and to underscore just how stupid they make both *me* and the Journal itself to [*sic*] look." (Choe Aff. ¶ 11 (emphasis in original)) Choe's 17 substantive errors can be grouped as follows: "treaty" was changed improperly to "FCN Treaty" in 12 places; "treaty" should have been "Treaty" in two instances; "parent's" should have been deleted in three references to the FCN Treaty; five footnote cross-references were misnumbered; two sentences needed rewriting; and numerous typographical errors marred the text. (McCarthy Aff. ¶ 11, Ex. C) Of these, the most serious are the unwanted appearance of the word "parent's" in three places. (Choe Dep. at 211; McCarthy Aff., Ex. C at 1133, 1143, 1145) The three sentences, with the word "parent's" bracketed, are as follows:

> In *Sumitomo,* the Supreme Court rejected the right to assign defense and unanimously held that U.S. subsidiaries of Japanese companies can not take advantage of the [parent's] rights conferred by Article VIII(1).

Sumitomo argued that under the FCN Treaty, the legal form of the [parent's] U.S. investment is not significant.

Finding it unlikely that the FCN Treaty would permit Japanese companies to manage U.S. subsidiaries while depriving the subsidiaries of the [parent's] ability to invoke the FCN Treaty's protections, the court held that Sumitomo was a "company of Japan" protected by Article VIII(1).

(McCarthy Aff. Ex. C at 1133, 1143, 1145) After meeting with Choe, the Board decided that it would print an errata sheet. (Choe Aff. ¶ 12) Choe did not accept that solution, and instead filed this action.

Between the time he met with the ILJ Board and the time he sued, Choe found many additional errors in his Comment. (Choe Aff. Ex. 3) Most of his suggested corrections "are absolutely necessary [sic] and undebatable errors of substance, some even being obvious to the naked eye [sic]." (Choe Aff. ¶ 21(c)) Although Choe apparently kept no copies of the proofs he corrected, he asserts that he has "pretty much a photographic recall of my final corrections," and claims that the mistakes that marred his Comment were either not present in the second page proofs, or were corrected by him during the July meetings. (Id. at ¶ 21(a)–(c)) Choe testified that readers of his Comment in its current form would think the "author was very sloppy, careless, and stupid for putting some words where they don't belong." (Choe Dep. at 215) Despite the errors, however, readers would "uncover the essential meaning and, you know, realize that it is a good, well-researched, and argued piece; just that they would think it was done by someone who was a terrible writer." (Id.) Choe's realization that his Comment would be understood by readers in its current form was borne out when a student Note in the *Stanford Law Review* cited accurately Choe's arguments in two footnotes. (Vairo Aff. ¶ 6, Ex. A) Choe conceded at his deposition that the Stanford Note recorded accurately his Comment's argument. (Choe Dep. at 210)

Plaintiff asserts a variety of federal and New York State claims, including violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); violation of moral rights under the common law of the United States and of New York State; libel; breach of contract; negligence; and invasion of privacy. (Amend.Compl. ¶¶ 15–39) In their Answer, defendants assert six affirmative defenses, including contributory negligence, lack of reliance on defendants' acts or omissions and good faith.

## II.

Section 43(a) of the Lanham Act provides, in pertinent part, that:

[a]ny person who ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). Plaintiff alleges that his "mangled" Comment gives rise to a Lanham Act violation under *Gilliam v. American Broadcasting Co.*, 538 F.2d 14 (2d Cir.1976). In *Gilliam*, defendant ABC had aired, under license from the British Broadcasting Corporation, various programs of "Monty Python's Flying Circus," written by the British comedy troupe of that name. When ABC aired the programs, it edited them without the group's permission. The version shown by ABC "at times omitted the climax of the skits to which appellants' rare brand of humor was leading and at other times deleted essential elements in the schematic development of a story line." *Id.* at 25. In one of the unedited skits, for example, an English upper-class family was discussing the tonal quality of words such as "woody" or "tinny." The father then used the words "woody" and "tinny" in sexually-charged language, which led the mother to douse him with a bucket of water. The skit then continued. *Id.* at 25 n. 12. In the ABC version, in contrast, the entire discussion leading up to the dousing was edited out. The father therefore appeared at one moment dressed and dry, and

in the next moment "shown in a soaked condition without any explanation for the change in his appearance." *Id.*

The Court found that a Lanham Act claim arises when a television program is "designated as having been written and performed by a group ... [but] has been edited, without the writer's consent, into a form that departs substantially from the original work." *Id.* at 24. When a network "deform[s]" an artist's work and "presents him to the public as the creator of a work not his own," the network makes the artist "subject to criticism for work he has not done." *Id.* In such cases, the creator or performer "suffers the consequences of the mutilation." Therefore, an "allegation that a defendant has presented to the public a 'garbled,' distorted version of plaintiff's work ... should be recognized as stating a cause of action" under the Lanham Act. *Id.* at 24–25 (quotation omitted).

Plaintiff cites also three district court decisions. In *Lish v. Harper's Magazine Found.*, 807 F.Supp. 1090, 1093 (S.D.N.Y. 1992), plaintiff asserted that defendant magazine published a letter he wrote with approximately half its contents removed, and without any markings such as ellipses. The only indication that the letter had been edited was a brief statement in the introduction. After trial, the Court found for defendant on Lish's Lanham Act claim because Lish had not provided sufficient evidence that "Harper's version of the Letter substantially distorted the original." *Id.* at 1107. In *Schatt v. Curtis Management Group, Inc.*, 764 F.Supp. 902, 913 (S.D.N.Y.1991), plaintiff cross-claimed that defendants' use of his photographs violated the Lanham Act because they failed properly to credit plaintiff as copyright holder. The Court denied plaintiff's motion for summary judgment because the issue of copyright proprietorship remained unresolved. *Id.* at 914. *Follett v. New Am. Library*, 497 F.Supp. 304, 311–12 (S.D.N.Y.1980), presented the issue of whether plaintiff authored or edited a book published by defendant. The Court held that defendants violated the Lanham Act by designating Follett as the author of the book. *Id.* at 312.

Plaintiff's claims here are easily distinguishable from the facts in *Gilliam* and in the three district court decisions. The issue is whether the published Comment departed so substantially from the original work that Choe may be said not to be its author. *Gilliam*, 538 F.2d at 24. Even if the court disregards plaintiff's admission that he is the author of the Comment (Choe Dep. at 8, 221–22, 225), and assumes that all the alleged errors plaintiff presents in his most recent marked-up version of his Comment, *see* Choe Aff. Ex. 3, were made by the ILJ editors, plaintiff fails to state a valid Lanham Act claim.

In *Gilliam*, defendants radically altered the content of plaintiffs' performances. The edited version simply made no sense. It was impossible for the audience to understand, for example, why the mother doused the father with water. The humor was not in the act of throwing the water, but in the discussion preceding the act. The closest plaintiff can come to meeting this high standard is to assert that the addition of the word "parent's" radically altered the meaning of his Comment. He presents no evidence, other than his own *ipse dixit*, that readers would be so confused by this addition that they would fail to understand his argument. Plaintiff himself admitted at his deposition, however, that even with all of the alleged errors in place, readers would be able to "uncover the essential meaning" of his Comment. (Choe Dep. at 215) The student note in the *Stanford Law Review*, which discusses Choe's Comment, demonstrates the accuracy of plaintiff's prediction, and also distinguishes his claim from those alleged in *Gilliam*.

Choe's allegation of "mutilation" also pales in comparison to the drastic editing performed in *Lish*, which the Court nonetheless determined failed to comprise the substantial distortion required to maintain a successful Lanham Act claim. *See also Playboy Enter., Inc. v. Dumas*, 831 F.Supp. 295, 315–17 (S.D.N.Y.) (plaintiff's evidence showing 40% of his work changed failed to meet burden of demonstrating substantial alteration), *modified on other grounds*, 840 F.Supp. 256 (S.D.N.Y.1993), *aff'd in part, rev'd in part*, 53 F.3d 549 (2d Cir.1995). *Schatt* and *Follett*,

as the discussion above reveals, had nothing to do with an alleged mutilation or distortion of plaintiffs' works. Choe's admission that he alone is the author of his Comment (Choe Dep. at 8, 221–22, 225), distinguishes further his claim from the one asserted in *Follett.* Because it cannot be said that the scores of alleged typographical and substantive errors in Choe's Comment "present[ed] him to the public as the creator of a work not his own," his Lanham Act claim must fail. *See Considine v. Penguin, U.S.A.,* No. 91 Civ. 4405, 1992 WL 183762, at *5 (S.D.N.Y. July 20, 1992) (granting defendant summary judgment on Lanham Act claim because defendant's alleged factual and stylistic "mangling" of plaintiff's article failed to meet high standard set by *Gilliam* ).

 There is no federal claim for violation of plaintiff's alleged "moral rights." The Court in *Gilliam* stated that nearly 20 years ago. 538 F.2d at 24 ("American copyright law ... does not recognize moral rights or provide a cause of action for their violation"). *Gilliam,* as the discussion above reveals, did not involve a federal common law claim of "moral rights"; it involved an analysis of § 43(a) of the Lanham Act. The second case plaintiff cites, *Community for Creative Non-Violence v. Reid,* 846 F.2d 1485, 1498–99 (D.C.Cir.1988) (Ginsburg, J.), *aff'd,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), stated that defendant, a sculptor, *"may* have rights against [plaintiff] should it publish an excessively mutilated or altered version" of his work. (emphasis added) The only case cited in support of that statement was *Gilliam,* which, as pointed out above, held that there was no "moral rights" claim. Whatever language there may be in *Reid* or *Gilliam* to suggest a federal common law claim for deprivation of an author's "moral rights" is dictum, and has not generated any claim in this Circuit for almost 20 years. The dictum itself is not the kind of prescriptive statement intended to guide trial courts in later cases, but only language intended, perhaps, to "stimulate informed commentary" or to "provoke future consideration of emerging issues." *United States v. Oshatz,* 912 F.2d 534, 540 (2d Cir.1990), *cert. denied,* 500 U.S. 910, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991). Even if the idea of a "moral rights" claim

presented an "emerging issue" in 1976, when *Gilliam* was decided, or in 1988, when *Reid* was decided, the failure of that issue to emerge fully as a recognized claim by now suggests that such emergence should occur in the first instance, if at all, at the circuit level and not in this court. The creator of the work in *Reid,* of course, could now bring an action under the Visual Artists Rights Act of 1990 ("VARA"), for any "distortion, mutilation, or other modification" of his work. 17 U.S.C. § 106A. VARA, however, protects only authors of a work of visual art. *Id.*

The only other federal case plaintiff cites, *National Bank of Commerce v. Shaklee Corp.,* 503 F.Supp. 533, 544 (W.D.Tex.1980), did not even mention a cause of action for "moral rights." Plaintiff asserts also that the Berne Convention for the Protection of Literary and Artistic Works, Article 6*bis,* confers a right of action in federal court for violation of "moral rights." The Berne Convention, however, does not confer federal jurisdiction. *See* 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8D.02[D], 8d–15–30 (1994) (Convention itself, as adopted, does not create federal common law action for violation of author's "moral rights").

Because the law in this Circuit does not recognize an author's common law "moral rights" to sue for alleged distortion of his written work, plaintiff's purported "moral rights" claim is dismissed. Absent federal jurisdiction, there is no reason to hear plaintiff's pendent state law claims in this court, and they too are dismissed. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Strong v. Board of Educ. of Uniondale Union Free Sch. Dist.,* 902 F.2d 208, 213 (2d Cir.1990).

SO ORDERED.