**Gordon LISH, Plaintiff,**

v.

**HARPER'S MAGAZINE FOUNDATION,
Defendant.**

No. 91 Civ. 0782 (MEL).

United States District Court,
S.D. New York.

Nov. 24, 1992.

As Amended Dec. 1 and Dec. 3, 1992.

On Reconsideration Jan. 7, 1993.

Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff; Jonathan J. Lerner, Paul Dutka, John Horan, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for defendant; Gregory L. Diskant, Rhonda Brown, Ellen Rothschild, of counsel.

LASKER, District Judge.

The December 1990 issue of Harper's Magazine contained a piece under the title of "A Kind of Magnificence," which the table of contents described as by Gordon Lish. The magazine was distributed to more than 200,000 readers.

Lish is a well-known and controversial figure in the publishing industry—an avant-garde fiction writer associated with minimalism, an editor at Alfred A. Knopf Inc. and a teacher of creative writing. His writing class "was then and probably still is one of the most famous, well known, controversial creative writing classes in the country." [1] "A Kind of Magnificence" was a consolidation of excerpts from a letter Lish sent to 49 prospective students introducing them to his fall 1990 writing class (the "Letter").[2] It was published without a request for or receipt of Lish's permission.

Harper's is a monthly magazine which covers politics and culture. Each issue contains a section or department designated "Readings," devoted to noteworthy documents and materials which Harper's' editors describe as "found objects." These include speeches, letters, memos and the like which circulate in the community and which are informative or illustrative of contemporary society.

Harper's received a copy of the Letter in the late summer of 1990 from one of its "stringers," individuals employed on a freelance basis and paid on a retainer to procure material for possible publication in Harper's. The stringer had in turn obtained the Letter from a person (the "source") who had indicated to Lish an interest in joining the class. The Letter was delivered to Michael Pollan, executive editor of Harper's who has primary responsibility for Readings.

Pollan concluded that the Letter was an ideal candidate for inclusion in Readings, but knew that Lish would probably be upset by its publication and so brought the Letter to the attention of Lewis Lapham, editor-in-chief, and John R. MacArthur, the publisher, of Harper's. Lapham and MacArthur approved publication of the Letter.

The Letter as edited was printed with a brief introduction in the December 1990 issue. It was decided that because of limited magazine space available the Letter should be cut to approximately half its size:

The Letter was reduced from 2,308 to 1,206 words. (The length of items in Readings varies from 100 to 3,000 words, and averages about 1,000 words.) The deletions—totalling approximately 48% of the excerpt—were not marked by ellipses. The only indication in the magazine that the Letter had been edited at all was the statement in the introduction, "From an introductory letter sent last summer by Gordon Lish to students enrolled in his fall fiction writing workshop." [3]

Lish claims that the publication of the edited version of the Letter infringed his copyright, defamed him, falsely designated the origin of the Letter, and intentionally inflicted emotional distress on him.

Lish copyrighted the Letter. It clearly enjoys protection under § 106 of the Act unless its publication falls within the exception for fair use under § 107. The question whether the publication constitutes fair use is the principal issue in this case.

The case has been tried to the bench.

### I.

*Lish*

Lish is well-known as an editor and discoverer of literary talent; "his area of writing is modern fiction and he is an exponent of minimalism, a new genre of writing" (Tr Lish Opening Statement at 2). He has sponsored and edited the writings of, among others, Harold Brodkey, Cynthia Ozick, Don DeLillo, Barry Hannah, Raymond Carver, Yannick Murphy, Richard Selzer, David Leavitt, Nancy Lemann, Amy Hempel, Denis Donoghue, Bette Pesetsky, Janet Kauffman, and Mary Robison. From 1969 to 1977, Lish was fiction editor at *Esquire* magazine. Since 1977, he has been an editor at Alfred A. Knopf, Inc., and is the editor of *The Quarterly*, a literary journal.

Lish has also written eighteen works of fiction and non-fiction, including six novels, as well as numerous short stories, essays,

---

1. In the words of Lewis Lapham, Editor-in-Chief of Harper's. Tr. at 312.

2. Throughout this opinion the expression "the Letter" refers to Lish's letter as written by him.

3. Exhibit A is a copy of the original Letter, and Exhibit B is a copy of the Letter as it was published in Harper's.

and articles, of his own. In addition, he has been a teacher of writing on the faculties of Yale, Columbia, and New York Universities. However, the principal source of his fame/notoriety in recent years has been private writing seminars he began teaching five years ago. The classes, attended by many well-known writers, meet in private homes in New York City. Between 20 and 25 students attend each class. The classes meet for twelve weekly sessions once a week for approximately six hours. Lish currently teaches two sections of classes in both the fall and spring.

Lish's admirers describe him as an inspirational teacher, who has brought many of America's best young writing talents to the literary scene. His detractors regard his teaching methods as unconventional, even cult-like. Whatever the judgment, the cognoscenti seem to agree that he is one of the more visible and noteworthy American literary figures. In its August 1987 "Guide to the Literary Universe," *Esquire* magazine described Lish as being at the "red hot center" of the American literary scene. Lish himself testified at trial: "Do I believe that I have 'powerfully and indelibly entered the literary history of this century?' It's a most exorbitant statement but I think it has more than a core of truth in it, yes." (Tr. Lish 485).[4]

Lish has not shunned publicity. He has cooperated with the press on a number of occasions on stories about his teaching and writing and has been profiled in *Vanity Fair, Spy Magazine,* the *New Republic,* and *Esquire,* among other magazines. In addition, his writing seminars have been the subject of at least fifteen articles in recent years. What happens in his class, however, has on the whole been kept mysterious. Lish's course is conducted in an atmosphere of great privacy, and Lish imposes strict confidentiality upon his students. The first page of the Letter, for example, admonishes:

> To violate the confidentiality of the class is to dishonor yourself irreparably—and, further, to expose yourself to the lifelong contempt of those who took you to be a citizen of the humane arts.

*Harper's*

Harper's is a *venerable periodical which* was revived from decline by its current publisher John R. MacArthur in 1984. It is one of a limited number of magazines which cover both politics and culture and deal in "serious ideas" (Tr. Pollan 92). Its contents are known for being fast-paced and witty, and it has a reputation for printing material of a high literary caliber. Harper's' audience is exceptionally well educated and literate: 87.5% are college graduates, 49.7% hold a post-graduate degree, 97.1% have bought books in the past twelve months (in comparison to 40.4% of the population at large); they purchased an average of 23.5 books in 1990, and 26.6% have written material that has been published. (Defendant's Exhibit HK, 1991 Subscriber Study, Harper's Magazine).

"Readings" was initiated in 1984 by MacArthur and Lapham, the editor-in-chief. It specializes in bringing primary source material to light. Its contents are printed with minimal editorial comment in order to permit the reader to make his or her own judgment about the work. According to Pollan, two types of documents appear in Readings: (a) creative works written for sale, for which Harper's seeks the author's permission before publication (Harper's usually pays for these items) and (b) documents such as "form letters, court transcripts, and government memos that are circulating in the society" for which Harper's does not seek the author's permission (Tr. Pollan 96).

*The Letter*

In describing his decision to print the Letter, MacArthur, the publisher, testified:

A. I put several questions to [Pollan]. I asked him, first of all, if he thought it was really newsworthy. And he said, "Yes." And from his description of the letter it sounded very newsworthy to me.

Q. I don't mean to interrupt you. With respect to Mr. Pollan's description that led you to conclude it was newsworthy, "it sounded newsworthy to me," what

---

4. "Tr." refers to trial transcript.

did he say about the letter that led you to that conclusion?

A. He said it was a letter from Mr. Lish that gave a kind of inside look at a very famous writing workshop in New York. And would be of great interest to our readers because we serve—well, I didn't go that far. He just said that it was an inside look, a unique document that he thought would be very interesting for people to read. For our readers.

. . . .

Q. What if anything did Mr. Pollan say to you that led you to conclude that it was unique?

A. It was in Mr. Lish's voice. It was like many Readings documents. It was a primary document. One that you wouldn't get—you get something from it that you wouldn't get from an account, a secondhand account.

(Tr. MacArthur 341–42). One may conclude from the spirit of their testimony that MacArthur and Harper's' editors were also intrigued by the aura of Lish's personality as reflected in the Letter.

The Letter contains a variety of material ranging from nuts and bolts details about the logistics of the class, instructions as to how students are expected to behave in class, to passages of exuberant rhetoric exhorting students to heroic efforts. The Letter was interesting both for its factual and stylistic content. As Harper's' own witnesses repeatedly testified, Lish's rhetoric was a significant aspect of the Letter. According to Harper's, one of the four principal components of the Letter was Lish's "inspirational rhetoric." (Tr. Pollan 102–103).

Harper's listed the Letter in the table of contents of the December 1990 issue, naming it "A Kind of Magnificence," a phrase borrowed from the Letter itself.[5] Lish was shown as the author without any indication that the Letter had been severely edited or that it was printed without Lish's permission.

In addition, Harper's took steps to procure advance publicity about its prospective publication of Lish's letter. Pollan assigned this responsibility to Ellen Ryder, Harper's' Vice President and publicist, who informed *New York Magazine* of the expected publication. As a result, the November 1990 issue of *New York Magazine*, which appeared on the newsstand prior to the December 1990 issue of Harper's, included a brief item about the publication-to-be of Lish's Letter in Harper's. The *New York Magazine* article quoted verbatim passages from the Letter. Pollan agreed, when questioned at trial, that it was "fair to say that in doing so Ms. Ryder, the publicist, was seeking to generate publicity about Harper's' printing of Mr. Lish's letter" and that that was done to enhance sales and awareness of the magazine. (Tr. Pollan 25, 144–45).

*Witnesses*

The fact witnesses at trial consisted of Lish, MacArthur, Pollan, and Lapham. In addition, each side called an expert witness to testify about common practices in the industry with respect to editing, use of ellipses and other related topics. Plaintiff's expert, Roger Rosenblatt, is a contributing editor of *Vanity Fair*, the *New Republic*, and *Family Circle*, essayist for the MacNeil/Lehrer News Hour, teacher of creative writing, and the author of four books and numerous articles. Rosenblatt has previously been a literary editor of the *New Republic*, the editor of the World section of *Time*, an editor of *U.S. World and News Report*, and a professor of literature and writing at Harvard.

Harper's' expert, William A. Honan, is the chief cultural correspondent for the *New York Times*. Honan has been on the staff of the *Times* since 1969 and was its chief cultural editor from 1982 to 1989. He has also been an editor at the *Saturday Review*, the *New Yorker* and *Newsweek*, and has written two books and numerous articles.

---

5. Only six of the seventeen pieces in the December 1990 Readings section were selected for listing in the table of contents.

Both experts were contacted by counsel for the respective parties but neither accepted compensation for his testimony. In Rosenblatt's opinion, Harper's' editor of the Letter transformed the Letter from "a serious and sometimes moving and impressive piece of work" to a piece that made Lish look ridiculous (Tr. Rosenblatt 512). Of his reasons for testifying, he said

I believe that journalism protects itself when it owns up to its mistakes and doesn't hurt people. So my reasons for testifying really are in support of journalism rather than against it.

(Tr. Rosenblatt 508–09).

When asked why he was testifying, Honan stated:

A: Well, I believe the case is important.
Q: Why is that?
A: Well, I think it strikes to the heart of freedom to publish and First Amendment rights which are fundamental to our democratic society.

(Tr. Honan 720).

### II.

Harper's contends that its publication of the edited version of the Letter constituted a fair use of the material, permissible under the Copyright Act. Section 107 of the Copyright Act provides:

*Limitations on exclusive rights: Fair use*

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purpose;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The doctrine of fair use "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *New Era Publications Int'l, ApS v. Henry Holt and Co.*, 873 F.2d 576, 589 (2d Cir.1989), *cert. denied*, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990) (Oakes, C.J., concurring).

██ The governing principle in the application of fair use is that it is an "equitable rule of reason." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 448 & n. 31, 104 S.Ct. 774, 792 & n. 31, 78 L.Ed.2d 574 (1984), quoted in *New Era*, 873 F.2d at 589. Accordingly, each case requires a particular determination whether a specific use is fair. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 549, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985) ("*Nation*").[6]

## A. THE PURPOSE AND CHARACTER OF THE USE

██ Whether the defendant acted in good faith in using the appropriated material is an element under the first fair use factor. *Nation*, 471 U.S. at 562, 105 S.Ct. at 2231 ("relevant to the 'character' of the use is 'the propriety of the defendant's conduct'"). Lish contends that Harper's acted in bad faith in the manner in which it obtained and edited the Letter.

██ In *Nation*, the Supreme Court held that it makes a difference whether a user obtained his copy of the original work lawfully or by theft:

"Fair use presupposes 'good faith' and 'fair dealing.'" The trial court found that The Nation knowingly exploited a purloined manuscript.

---

**6.** While the case is commonly referred to as *Harper & Row*, in order to avoid confusion with this case in which the defendant is Harper's, it is referred to as *Nation*.

471 U.S. at 562–63, 105 S.Ct. at 2232 (citation omitted). However, here, it does not appear that the Letter was obtained in bad faith since, unlike *Nation* and *New Era*, where the quoted documents were stolen, the Letter was sent by Lish to the source, who was free to deliver it to Harper's. As to Lish's complaint that Harper's did not request or receive his permission to publish the Letter, in *Wright v. Warner Books, Inc.*, 953 F.2d 731 (2d Cir.1991), the Court of Appeals characterized the failure of the defendant to secure the writer's permission for use "beside the point" so long as the appropriation meets the standards of fair use. *Id.* at 737.

■ Nor is there merit to Lish's assertion of bad faith in connection with Harper's' editing of the Letter. Lish argues that Harper's malevolently distorted the Letter and falsely presented it to the public as Lish's own work. Fairness of the treatment or editing of the material is an element of good faith. However, Pollan testified credibly, upon searching and lengthy examination by Lish's counsel (*see, e.g.,* Tr. 73–90, 108–110 and 121–128), to his and Harper's' motives and reasons for the decision to publish the Lish material and for the particular deletions made; and his testimony (supplemented by that of Lapham and MacArthur) emphatically established Harper's' good faith in the circumstances. Furthermore, as discussed below, Lish has failed to prove that the Letter was substantially distorted.

Factor one, therefore, turns solely on the nature of Harper's' use of the Letter.

\* \* \*

■ Harper's argues that its publication of the Letter was for the protected purposes of criticism, commentary and news reporting—to provide an "inside look" at Lish's class. (Tr. MacArthur 341). § 107 provides that fair use may be made of material "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107.

Lish contends that Harper's' use of the Letter falls into none of these categories since Harper's published the copied portion of the Letter without any accompanying criticism, scholarship, research, or commentary. He asserts that Harper's' use constituted a purely reproductive taking—a clear form of commercial piracy. However, this view of the matter is too narrow. Although the published material contained no accompanying criticism or commentary, the Letter itself was newsworthy because of the notoriety of the Lish writing classes and of Lish's persona. As Honan testified:

[I]n the world of culture and publishing, Mr. Lish is known and he is controversial. That in a very fundamental way makes it newsworthy.

In addition to that, when you read this letter, you recognize that here is a teacher who is certainly not your usual type of teacher who is a specialist and perceptive and thoughtful.... Here in fact is a teacher, a kind of guru, who tells his students to do exactly as I say, including down to bathroom conduct and eating habits and so forth, and if you do, I will then make you worthy of the notice of history.

Well, that is quite heady stuff, and it smacks of the sorts of appeals that are used by the leaders of the EST movement, the transcendental meditation movement, and so forth, and to find a prominent New York publisher using these same techniques is indeed newsworthy.

(Tr. Honan 723).

■ "[T]here is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in § 107 [i.e., criticism, scholarship, news report or research]." *Wright*, 953 F.2d at 736. Nevertheless, qualification of the Letter as newsworthy is not the end of the question. The Supreme Court has held that "The fact that the words the author has chosen to clothe his narrative may of themselves be 'newsworthy' is not an independent justification for unauthorized copying of the author's expression prior to publication." *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 557, 105 S.Ct. 2218, 2229, 85 L.Ed.2d 588 (1985). The Court further noted: "The fact that an article is

originally 'news' and therefore a productive use is simply one factor in a fair use analysis." *Id.* at 561, 105 S.Ct. at 2231.

In the present case, it is admitted that a fundamental reason for Harper's' publication of the Letter was to present Lish's expression, or, as Harper's' witnesses put it, Lish's "inspirational rhetoric."

Q. You would agree with me that Mr. Lish's letter contains his own unique style of inspirational rhetoric?

A. Yes.

Q. By that you mean language with a purpose to inspire certain feelings and inspire a mood in a reader?

A. Yes.

Q. In publishing Mr. Lish's letter and in editing the letter, did you attempt faithfully to reproduce that inspirational rhetoric?

A. Yes.

(Tr. Pollan 107). Pollan conceded that everything else of interest in the Letter could have been communicated in an article about the Letter without quoting from the Letter itself, but that under such circumstances what would have been missing was the "manner of expression" (Tr. Pollan 103)— what Lapham described as "eloquence of tone" (Tr. Lapham 298)—and that that quality could be conveyed only through reproduction. Pollan testified:

Q: In fact, Harper's has turned down, has it not, proposals to write factual articles about Mr. Lish's writing class?

A: I've been approached by writers, yes, who have proposed doing that kind of article and we have turned them down.

Q: Why did you turn them down?

A: Because it had been done before. Many times.

Q: That would have conveyed this factual information about the class that the literary community was interested in, wouldn't it?

A: No. It would not have done everything that the publication of the letter did.

Q: I was just talking about the factual information.

A: Yes, it would.

Q: What's in the evidence that could not have been conveyed factually is the manner of his expression, correct?

A: The manner of his expression conveyed other kinds of facts.

Q: But it's also the manner of his expression was conveyed by publishing the letter.

A: Yes.

(Tr. Pollan 102–103). When Pollan was asked, "Did you capture the heart of the manner of his expression?", he responded, "Yes." (Tr. Pollan 107).

The argument that the precise manner in which an author expressed himself was as newsworthy as what he had to say and that its reproduction was therefore a fair use, is the very argument which the Supreme Court rejected in *Nation.* The Court observed: "Respondents' theory, however, would expand fair use to effectively destroy any expectation of copyright protection in the work of a public figure.... The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report' of the book." *Nation,* 471 U.S. at 557, 105 S.Ct. at 2229.[7] Moreover, in *Salinger v. Random House, Inc.,* 811 F.2d 90 (2d Cir.), *cert. denied,* 484 U.S. 890, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987), the Court of Appeals of this Circuit's first decision on the subject following the *Nation,* the court emphasized that: "vividness of expression is precisely an attribute of the author's expression that he is entitled to protect." 811 F.2d at 96. And in *New Era Publications Int'l, ApS v. Henry Holt and Co.,* 873 F.2d 576, 589 (2d Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990) (*"New Era "*), the court again emphasized that: "An author's expression of an idea, as distinguished from the idea itself, is not considered subject to the public's right to know." *Id.* at 584.

7. In *Nation,* the Court held that the publication by *The Nation* magazine of excerpts from the soon to be released memoirs of Gerald Ford was not a fair use.

Harper's asserts that it printed as much of the Letter's expressive content as it did, solely to demonstrate Lish's character or teaching style, as distinct from his mode of expression. However, this claim does not add up. Harper's knew that because Lish was a famous writer and teacher of writing, its readers—who, it should be noted, buy an average of 23 books a year—would be interested in reading the Letter as an example of his manner of expression.

Lish himself described the Letter as demonstrating the type of experimental writing he hoped to inspire in his students:

Q: Is there any literary content to your letter?

A: Well, yes. The letter is an exhibition of a certain kind of stylistic device in order to demonstrate the elasticity of the sentence, a way of provoking the students to begin to see the various ways in which sentences can be produced. The letter swerves from the hifalutin to the ordinary to the slangy. It's a way of demonstrating by these devices the variety of ways in which effects can be produced linguistically.

(Tr. Lish 390–91). Pollan referred to one of the passages that Harper's published as "a brilliant flight of rhetoric." (Tr. Pollan 188). Honan, Harper's' expert, characterized the Letter as:

—clever; on the other hand, it is deeply felt. It is a little outrageous; it is terribly earnest. It is mundane and it is inspirational. It is a mess, and at the same time very effective salesmanship, I think.

(Tr. Honan 730). And Lapham, the editor of Harper's, testified:

it had the two qualities that Dickens always used to say was the point of any kind of writing. It was both instructive and entertaining. It was a high-flown piece of rhetoric, entertaining in and of itself. And it also was newsworthy be-cause it spoke to the mechanics of what was then and probably still is one of the most famous, well known, controversial creative writing classes in the country. (Tr. Lapham 311–312).

In sum, there is no question that Harper's' published version of the Letter is a reproduction of Lish's writing style and use of language, and it is a fair conclusion that the interest the Letter would hold for Harper's' readers had as much to do with observing Lish's writing style as with gaining an inside look at his writing class.

■ Using copyrighted work to demonstrate an author's writing style is condemned.

*Salinger* makes it very clear, however, that quotations used merely to demonstrate writing style may not qualify for the fair use defense.

New Era Publications Int'l, ApS v. Henry Holt and Co., 873 F.2d 576, 592 (2d Cir. 1989), cert. denied, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990) (Oakes, C.J., concurring). As cited above, "vividness of expression is precisely an attribute of the author's expression that he is entitled to protect." *Salinger,* 811 F.2d at 96.[8]

Harper's contends that it did not seek to demonstrate Lish's writing style but to reveal, through his expression, facts about his character and the way that he ran his class: "There were facts you couldn't convey without the expression." (Tr. Pollan 189).

It is true that since *New Era* and *Salinger,* the Second Circuit has refined its rule on use of an author's unpublished expression and now seems to permit an exception when a direct quotation of the author is necessary to report a fact accurately and fairly. In *New Era Publications Int'l, ApS v. Henry Holt, Co.,* 884 F.2d 659 (2d Cir.1989), Judge Newman, joined by Chief Judge Oakes and Judges Kearse and Win-

---

8. The late E.B. White, master and teacher of style, once wrote to his editor, speaking of another writer: "I think in general his trouble was that like many a teacher of English, he felt that to write effectively a man had to be master of certain tricks and devices, had to know the formula. My own belief is that no writing, by anybody, begins to get good until he gets shed of tricks, devices and formulae." (E.B. White to Cass Canfield, in *Letters of E.B. White* 514 (Dorothy Lobrano Guth ed., Harper & Row 1976)). Whether or not style contains tricks and devices it is protected material.

ter, dissenting from denial of rehearing *en banc,* concluded that in those "limited circumstance where copying is necessary fairly and accurately to report a fact set forth in the author's writings" the doctrine of fair use "permits some modest copying of an author's expression." *Id.* at 662. The Supreme Court first suggested such an exception in *Nation,* noting that some brief quotes might be "necessary adequately to convey the facts," 471 U.S. at 563, 105 S.Ct. at 2232, as where a phrase is "perhaps so integral to the idea expressed as to be inseparable from it," *id.* This view appears to have gained favor in recent cases.

> The biography's use of Wright's expressive works is modest and serves either to illustrate factual points or to establish Dr. Walker's relationship with the author not to "enliven" her prose.

*Wright v. Warner Books, Inc.,* 953 F.2d 731, 740 (2d Cir.1991).

Harper's contends that the published version of the Letter vividly illuminates all of the traits for which Lish is famous: his high-flown rhetoric, his overpowering ego, and the inner workings of his famous writing class. Pollan testified:

Q: Why are you illustrating with this rhetoric, why are you printing it in Harper's?

A: Well, to me this is the essence of Gordon Lish's teaching methods and the promise he holds out. This isn't just about learning a craft. This is about changing your life. This is about entering completely uncharted territory. This is whatever your life is there can be excellence in it.

This is what he seems to offer people. And this is what they respond to. And it's very stirring in some ways and it's very outrageous in others.

Q: You referred when Mr. Lerner was examining you that the letter contains certain facts. I think you can give us some examples of those. But I also think you said there were facts in the language. What do you mean by that?

A: There were facts you couldn't convey without the expression. That's a good example of it.

If you want to get across how affecting Gordon Lish obviously is to legions of students who think their life has been changed by him, you need to know how he does it and the kinds of things he says. That is not susceptible, I think, to adequate summary.

You also get from the expression his obsessiveness with the depth of his commitment and the monumental ego at work, of just how much he can do if you will surrender your self to him.

(Tr. Pollan 189).

However, even if the Second Circuit recognizes a limited right to copy expression where necessary to report factual information fairly and accurately, Harper's published a substantially greater portion of the Letter than was required to achieve that purpose. The decisions which allow limited copying of unpublished expression emphasize that only minimal copying is permissible. For example, in *Wright,* the court referred to "modest use" of Wright's expressive works, 953 F.2d at 740, and in *Nation,* the Court noted that "The Nation did not stop at isolated phrases," 471 U.S. at 563, 105 S.Ct. at 2232, but instead made a use of protected expression that "exceeds that necessary to disseminate the facts," *id.* at 564, 105 S.Ct. at 2232.

Harper's maintains that no more was taken than was necessary to convey the facts. However, Harper's used an unprecedented amount of unpublished material— over 1,200 words which amounted to 52% of the original and which, as published, took up more than a full page of the magazine. Such a taking was far more than that necessary to report factual information fairly and accurately.[9]

■ Finally, Harper's' argument that its use was permissible, under the statute, as being for a "non-profit educational" purpose because Harper's is owned by a non-profit foundation and operates at a loss, is

---

9. There is a distinction between "quantity" as it applies to the specific exception for limited borrowing of unpublished expression, and quantity as it applies to the third fair use factor, which is an inquiry about the amount of taking of creative expression overall.

unpersuasive. The statute does state that "whether such use is of a commercial nature or is for nonprofit educational purpose" is a relevant inquiry under the first fair use factor. However, the mere fact that Harper's is a non-profit organization that operates at a loss does not preclude a finding of "commercial use"; non-profit organizations enjoy no special immunity from determinations of copyright violation. The question under factor one is the purpose and character of the use, not of the alleged infringer. As Lish correctly points out, Harper's' objective is to sell magazines at a profit, and Harper's printed Lish's Letter as a means of enhancing the marketability of the December 1990 issue of the magazine (Tr. Pollan 25, 144–45). In sum, Harper's' use of Lish's Letter was of a "commercial nature."

In the light of these observations, Lish prevails on the first fair use factor.

### B. THE NATURE OF THE COPYRIGHTED WORK

■ As used in the statute, the phrase "the nature of the copyrighted work" refers, among other things, to whether the appropriated material is published or unpublished, factual or fiction/fantasy. *See Nimmer* § 13.05[A]. Harper's argues that the Letter is predominantly factual in nature. Factual works are works that are " 'primarily informational rather than creative.' " *New Era Publications Int'l, ApS v. Carol Pub. Group*, 904 F.2d 152, 157 (2d Cir.), *cert. denied*, 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990). "[T]he scope of fair use is greater with respect to factual than non-factual works." *Id.* Although the Letter does contain a mix of factual and creative material, a fair reading of the Letter demonstrates that it is predominantly inspirational and creative in nature. Since the Letter is predominantly creative, factor two favors Lish.

In addition, the Letter was unpublished. In *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), the Supreme Court held that "[t]he fact that a work is unpublished is a critical part of its 'nature.' .... [T]he scope of fair use is narrower with respect to unpublished works." *Id.* at 564, 105 S.Ct. at 2232. The Court further noted: "Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Id.* at 555, 105 S.Ct. at 2228. And in *Wright*, the most recent Second Circuit decision involving the use of unpublished material, the Court of Appeals observed:

> Where use is made of materials of an unpublished nature, the second fair use factor has yet to be applied in favor of an infringer, and we do not do so here.
>
> ....
>
> Our precedents, then, leave little room for discussion of this factor once it has been determined that the copyrighted work is unpublished.

953 F.2d at 737.[10]

Harper's contends that the Letter is not unpublished. It takes the position that the Letter is neither an unpublished memoir as in *Nation*, nor unpublished private correspondence as in *Salinger*, nor journal entries as in *New Era*,—but rather a published "form letter" which, according to Harper's, functioned as a "sophisticated and elaborate piece of promotion."

■ However, whether a work is published or not does not depend on a distinction—even assuming such a distinction were possible—between whether it is "literature" or "promotion," as Harper's suggests. The Copyright Act defines "publication" as "distribution of copies ... of a work to the public...." 17 U.S.C. § 101. Although the term "public" is not defined in the Act, the House Report explains that "the public" in this context refers to persons "under no explicit or implicit restrictions with respect to disclosure of its contents." H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 138 (1976), U.S.Code Cong.

---

10. On October 24, 1992, § 107 was amended by adding the following: "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all of the above factors." Even if the amendment had retroactive application, which there is no basis for believing that it does, it would not produce a different result in this case.

& Admin.News 1976, pp. 5659, 5754; *see also Nimmer* § 4.13[B], 4–72 & n. 20.

"Publication" thus turns on the question whether there were "implicit restrictions" on further distribution or disclosure of the document's contents. Here, the case is very strong that restrictions on further distribution of the Letter existed. *First,* it would be unnatural to conclude from the tone of the Letter, which stresses confidentiality within the class in the most emphatic language—

> To violate the confidentiality of the class is to dishonor yourself irreparably—and, further, to expose yourself to the lifelong contempt of those who took you to be a citizen of the humane arts

—that the contents of the Letter, which was something of a fixture-supplement of the class, should be held less confidential. As Mr. Honan, Harper's' own expert witness, testified:

> You can surmise from the letter, which even at one point specifies that the meetings described are going to be confidential, you know, you get a pretty good feeling that the author does not want it published.

(Tr. Honan 724).

In addition, judicial decisions support a finding that the Letter was "unpublished." In *Wright,* the Court of Appeals held that the journal entries at issue had not been published, 953 F.2d at 737, even though the journals had been sold to Yale University and were available through Yale to the public (if Yale had so chosen), *Wright v. Warner Books, Inc.,* 748 F.Supp. 105 (S.D.N.Y.1990). And in *Kunycia v. Melville Realty Co.,* 755 F.Supp. 566 (S.D.N.Y. 1990), the court held that the distribution of architectural drawings only to those directly involved in the project (*i.e.,* contractors, landlords, building authorities) did not constitute "publication."

Neither does Lish's distribution of the Letter to his class qualify, as Harper's claims, as "public dissemination." Public dissemination amounts to a general release of information. That is not what occurred here. Distribution of the Letter was restricted both by purpose and number: The Letter was sent only to the 48 people who took Lish's writing course in the fall of 1990 and the source, who Lish at the time believed likely to be a class member. Lish testified that the mailing of the Letter to the source was a mistake—that he meant to send his Letter only "to the persons I understood to be enrolled in the class." (Tr. Lish 393).

Harper's argues that the Letter was sent to a large group of people (49), that those who received the Letter were not members of a "closed group" since some of the students had not yet paid their tuition and sixteen of the forty-eight students were newcomers, and that no explicit restrictions on further distribution of the Letter appeared in the text of the Letter itself. However, none of these arguments is persuasive because none addresses or overcomes the critical proposition that there were "implicit restrictions with respect to disclosure" of the Letter's contents. Nor does the fact that the original copyright registration stated (until it was corrected by Lish's attorneys four days later) that the Letter was a published work, require a different conclusion, since Lish's designation of the work as published even if admitted is not decisive.

In sum, because of the predominantly creative and expressive nature of the material taken, a fact that is aggravated by the unpublished status of the material, Lish prevails on the second fair use factor.

## C. THE AMOUNT AND SUBSTANTIALITY OF THE PORTION USED IN RELATION TO THE COPYRIGHTED WORK AS A WHOLE

The third fair use factor involves consideration of the quantity and the quality of what was taken—"amount and substantiality of the portion used":

> This factor has both a quantitative and a qualitative component, so that courts have found that use was not fair where the quoted material formed a substantial percentage of the copyrighted work, or where the quoted material was 'essentially the heart of' the copyrighted work.

*New Era Publications Int'l, ApS v. Carol Publishing Group,* 904 F.2d 152, 158 (2d

Cir.), *cert. denied,* 498 U.S. 921, 111 S.Ct. 297, 112 L.Ed.2d 251 (1990) (citations omitted). Here, Lish wins on both counts: Harper's appropriated over 50% of the Letter, an unprecedented amount of use, and Harper's has conceded that it intended to take, and succeeded in taking, the "heart" of the Letter.

### Substantiality

Since *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985), the key factor in establishing substantiality of the portion used has been the degree to which the quoted material captures the "heart" of the copyrighted work. *Id.* at 565, 105 S.Ct. at 2233. At trial, Harper's admitted that it took the heart of the Letter. Pollan testified:

Q. In reproducing roughly 52 percent you believe you successfully captured the heart of the letter?

A. I did.

Q. Did you capture the heart of the manner of his expression?

A. Yes.

(Tr. Pollan 107).

Harper's urges that we should also "examine[ ] the proportion of the material taken to the entire contents of the 'Readings' section in determining substantiality—"

Here, ... the item itself made up only a small percentage of the "Readings" section in the December 1990 issue as a whole, which numbered 16 items, approximately 10,800 words, and 16 of an 80–page issue of Harper's.

(Defendant's Trial Memorandum at 19–20). However, both the Supreme Court and the Second Circuit have explicitly rejected this argument: "a taking may not be excused merely because it is insubstantial with respect to the infringing work." *Nation,* 471 U.S. at 565, 105 S.Ct. at 2233. *See Wright,* 953 F.2d at 738–39. As Judge Learned Hand trenchantly remarked, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Sheldon v. Metro–Goldwyn Pictures Corp.,* 81 F.2d 49, 56 (2d Cir.), *cert. denied,* 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936), quoted in *Nation,* 471 U.S. at 565, 105 S.Ct. at 2233.

### Amount

To compound the offense, Harper's published approximately 52 percent of Lish's Letter. In no other reported fair use case that has come to our attention has use of such a large percentage of unpublished expressive material been held to be a fair use. For example, in *Salinger,* where the court held that factor three favored the copyright holder, only one-third of 17 letters and 10% of 42 letters was used. 811 F.2d at 98.

Furthermore, Harper's' use of unpublished expressive material was unprecedented not only in the percentage, but in the absolute amount of the taking. Harper's appropriated more than 1,200 words from the Letter, which, as published, took up more than a full page of the magazine.

Harper's asserts that the use of 52% of the copyrightable material was no more than necessary for Harper's to represent Lish's ideas about writing and the class, but these propositions could have been conveyed to the reader by a considerably smaller excerpt. For example, Appendix C is a version of the Letter, which eliminates some 500 of the 1,206 words used by Harper's, and which, in the judgment of this finder of fact, conveys the spirit of the Letter by and large as successfully as Harper's' version. However, it is particularly important to note that even a 700 word excerpt would not pass muster if, as here, it included a substantial copying of expressive material which is more than necessary to accurately demonstrate facts.

Finally, there is no merit to Harper's' argument that Lish's statement that if Harper's published any part of the Letter Lish would "have preferred that they published the entire piece," supports Harper's position since Lish made it clear that his preference was that Harper's use none of the material at all.

Lish prevails on the third fair use factor.

### D. THE EFFECT OF THE USE UPON THE POTENTIAL MARKET FOR OR VALUE OF THE COPYRIGHTED WORK

The fourth fair use factor concerns the effect of the defendant's taking upon

the potential market for or value of plaintiff's work. The Supreme Court has described this criterion as "undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).[11] Lish has failed to prove any effect on either the present value or future value of the Letter.

*Effect on Present Value*

Lish contends that Harper's' appropriation was a "preemptive strike" of publication of a Lish class letter, by which, as we understand it, he means a "scoop." He points out that Harper's' own editors termed the Letter's publication a "journalistic coup" (Tr. Pollan 166) and asserts that Harper's deprived him of the opportunity to sell the Letter for monetary compensation by publishing its version of the previously unpublished Letter.

Lish asserts that before publication by Harper's the Letter did have commercial value:

> one could have disposed of this document if one so wished to do at a magazine such as Vanity Fair or Esquire, which magazines had registered interest in the goings-on in my class.

(Tr. Lish 443). However, aside from this expression of opinion, Lish provided no evidence that any publication had ever paid for such an item. Moreover, Lish conceded that he had never intended to publish the Letter, would not publish it in its present form, and had never attempted to sell it. (Tr. Lish 661).

> Q: Would you have permitted Harper's, through negotiations, to publish the fall 1990 class letter?
>
> A: No, of course not.

(Tr. Lish 678). The evidence of record thus leads to the conclusion that the Letter did not have "commercial value" of itself in December 1990. As Honan testified, "Its value is as news. It is a found object, so to speak." (Tr. Honan 743).

> Q. Would any publication in your experience be interested in paying the author for presenting this?
>
> A. No, I don't think so. In fact, that even rather smacks of what is called checkbook journalism, where—it is news. You don't pay for news. And to do so is frowned upon.

(Tr. Honan 744).

*Effect on Potential Market*

Neither has Lish proven that the publication of the Letter as edited had any significant effect on the potential future market for the Letter. It is true that Lish testified that he might write a book someday about teaching or writing in which he might include some version of the Letter and that he might publish a collection of his letters at a future date. (Tr. Lish 443). However, even if Lish were to use the Letter in a future book, it is not plausible that a buyer who had read the Letter in Harper's would be dissuaded from buying a book written by Lish on the teaching of writing simply because she had previously read the Letter. Moreover, it is extremely unlikely that the mere publication of this one letter would undercut demand for a book of Lish's collected letters or an autobiography, if one were ever created. Indeed, as was the case in *Maxtone–Graham v. Burtchaell,* 803 F.2d 1253 (2d Cir.1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987), "it is not beyond the realm of possibility that the [alleged infringing work] might stimulate further interest in the [copyrighted material]." *Id.* at 1264.

Lish has failed therefore to establish "*some* meaningful likelihood of future harm," *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 451, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984) (emphasis in original), necessary to make a case on the fourth fair use factor.

Harper's thus prevails on the fourth fair use factor.

---

**11.** *Cf. American Geophysical Union v. Texaco Inc.,* 802 F.Supp. 1, 21 (S.D.N.Y.1992) (Leval, J.) ("The statement in the *Nation* that the fourth factor is 'the single most important element,' 471 U.S. at 566 [105 S.Ct. at 2233], assumes a greater importance when quoted in isolation than it projected in the context of the *Nation* opinion as a whole").

## E. ADDITIONAL ARGUMENTS

By the express terms of § 107 of the Copyright Act, the four specified fair use factors are nonexclusive. Harper's presents two additional arguments.

 *First,* Harper's contends that the only rationale for copyright protection is to provide an economic incentive for authors to create useful writings and that those interests are not implicated where a work was not created for sale. However, it has long been recognized that "letters, like other literary works, are entitled to copyright protection." *Wright,* 953 F.2d at 735. Moreover, providing economic incentives for the creation of works of art is not necessarily the only value which the fair use doctrine embodies or protects. For example, the Supreme Court noted in *Nation* that one factor that "weighs against the use" of an unpublished work before its release is "the author's right to control the first public appearance of his expression." *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 564, 105 S.Ct. 2218, 2232, 85 L.Ed.2d 588 (1985). *See generally,* Lloyd L. Weinreb, *Fair's Fair: A Comment on the Fair Use Doctrine,* 103 Harv.L.Rev. 1137 (1990).

 Harper's also raises a First Amendment argument:

In balancing the aims of the copyright law and the purposes of the First Amendment, the press must have the right accurately to publish newsworthy material that does not implicate the purposes of the Copyright Act—a work that was not created for sale and that would not suffer a diminution of value as a result of publication.

(Defendant's Trial Memorandum at 4). However, contrary to Harper's' assertion that there is "a real danger that vast amounts of material could be hidden from public scrutiny," this disposition of the case poses no grave danger to the press's activities. To begin with, the copyright statute does not bar the reporting of facts or ideas found in a document. Copyright applies only to expression, never to facts or ideas. As the Supreme Court stated in *Nation:* "copyright's idea/expression dichotomy 'strikes[s] a definitional balance between

the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression.'" 471 U.S. at 556, 105 S.Ct. at 2228 (citation omitted). A journalist is always free, for example, to characterize and describe Lish's prose or even to use brief quotations for that purpose.

Furthermore, where the original text will best report the facts, copying the original words may be permissible because the quotation of a factual statement may involve no expressive content whatsoever. *See* Newman, *Not the End of History: The Second Circuit Struggles with Fair Use,* 37 J. Copyright Soc'y 12 (1990).

\* \* \*

 It may be conceded that Harper's' publication of "found" documents and other materials in "Readings" contributes to public education. Nevertheless, where, as here, more than 1,200 words and approximately 52% of the work were taken, and the defendant admits that what it sought to present to the public was the "heart" of the Letter, the taking does not qualify as a fair use. The fair use test is "a totality inquiry, tailored to the particular facts of each case." *Wright,* 953 F.2d at 740. Because of the necessity for flexibility in the application of the doctrine, it does not automatically follow that where, as here, one party prevails as to three of the four statutory factors, that party prevails in the suit. In the case at hand, however, the combination of factors favoring Lish dictates a verdict in his favor on the issue of fair use.

Accordingly, Lish has succeeded in proving a copyright violation in Harper's' publication of "A Kind of Magnificence."

## III.

Lish testified that next to his family the thing he cherishes the most and holds most dear are the words that he writes, the sentences he creates, the classes that he teaches. "My sentences are my garment. That's what I go out in public with." (Tr. Lish 434). In Lish's view, Harper's' edit distorted his words and made it appear that he had written something—the edited ver-

sion of the Letter—which was not his work.

> They took my writing, and with mischief in mind, in order to create what they imagined to be a newsworthy or titillating object, went forward and re-created another piece of writing from my writing. I regard that what they did is a horrendous distortion of my intention and an awful use of myself.

(Tr. Lish 694). According to Lish, Harper's aggravated the injury by listing his name in its table of contents, making it appear that he had submitted the piece for publication and approved its final form. (Tr. Lish 426).

## LANHAM ACT

Lish's Lanham Act claim is based on the contention that Harper's' edit of the Letter converted it to a work no longer his own. He claims that Harper's distorted his unique style and literary voice and presented a "garbled" version of the Letter to the public, palming it off as his work. According to Lish, naming him as the author of "A Kind of Magnificence" constitutes a false designation of origin under § 43(a) of the Lanham Act, which provides:

> Any person who, on or in connection with any goods or services ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
>
> 1) is likely to cause confusion, or to cause mistake, or to deceive as to the ... origin, sponsorship, or approval of his or her goods ...
>
> shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such Act.

15 U.S.C. 1125(a).[12]

In moving to dismiss at the end of the plaintiff's case, Harper's' counsel argued that the Lanham Act claim is invalid as a matter of law because (i) the Act encompasses only false and misleading "commercial speech", (ii) courts have construed the Act to require a party suing under the Lanham Act to be in competition with the other party, and (iii) the Lanham Act is not applicable to the contents of a magazine.

However, it is clear that the Lanham Act does apply to a situation such as the one at hand. For example, in *Wojnarowicz v. American Family Ass'n*, 745 F.Supp. 130 (S.D.N.Y.1990), in noting examples of "practices commercial in nature" to which the Lanham Act applied, the court cited *"Gilliam v. American Broadcasting Cos.*, 538 F.2d 14 (2d Cir.1976) (presenting garbled version of plaintiffs' comedy program to public)." *Id.* at 143. In *Gilliam*, original Monty Python programs were edited by ABC and rebroadcast as Monty Python work. The court found a violation of § 43 stating:

> the edited version broadcast by ABC impaired the integrity of appellants' work and represented to the public as the product of appellants what was actually a mere caricature of their talents.

538 F.2d at 25. The court held

> "To deform his work is to present [an artist] to the public as the creator of a work not his own, and thus makes him subject to criticism for work he has not done." Thus an allegation that a defendant has presented to the public a "garbled," distorted version of plaintiff's work seeks to redress the very rights sought to be protected by the Lanham Act ...

*Id.* at 24 (citations omitted).

More recently, in *Stephen King v. Innovation Books*, 976 F.2d 824, 828 (2d Cir. 1992), the Court of Appeals held that "a false reference to the origin of a work, or a

---

**12.** The complaint alleges:

Defendant's substantial deletions from the Letter, including that section in which Mr. Lish emphasized the confidential nature of his communications with his students, together with the introduction accompanying the altered version of the Letter, and the failure to utilize conventional and customary methods to disclose that substantial deletions had been made, falsely convey the impressions that Mr. Lish wrote the altered version of the Letter, and further, that he connived in and approved of its publication in *Harper's*, as an advertisement for his writing class. (Compl. ¶ 40).

reference which, while not literally false, is misleading or likely to confuse, may form the basis of a claim under section 43(a) of the Lanham Act." *Id.* at 828 (citations omitted).[13]

■ However, although Lish's allegations state a claim of false designation of origin under the Lanham Act, the evidence does not support the claim. In the typical Lanham Act case, either the material is false on its face or it is impliedly false. Here the material is not false on its face. "A Kind of Magnificence" was described by Harper's as being from a letter by Gordon Lish. That is true: The published Letter did originate with Lish, the person to whom it is attributed, and, although substantial deletions were made, the published version was taken in its entirety from the original—no words were added, no phrases changed.

So the burden is on Lish to prove by a preponderance of the evidence that a false message was communicated to a not insubstantial portion of the relevant audience, Harper's' readers. However, Lish has submitted no objective evidence, in the form of a reader survey or otherwise, which establishes the actual reaction of Harper's' readers to the respective versions of the Letter. The only evidence on the question of distortion offered at trial was the opinion testimony of Rosenblatt and Honan, the two expert witnesses, and the testimony of the parties. The testimony of the experts, not surprisingly, was so effectively presented that the opinions of each expert pretty effectively cancelled the other.[14] In the light of the strongly opposing views of the experts, neither of which was clearly more persuasive than the other, and in the absence of any survey evidence, the finder of fact must rely on his own judgment. Viewing the matter objectively on the scant evidence of record, I conclude that Lish has not proven by a preponderance of the evidence that Harper's' version of the Letter substantially distorted the original.

According to Lish, Harper's "interfered with the logic of the letter" and eliminated its "integrating theme." (Tr. Lish 410). Lish's counsel argued: "The cut was heavy, they changed the theme, they altered the tenor, they did it to make it newsworthy." (Tr. 706). Put another way, Lish contended that the result of the editing was to make him look foolish. The implication is that some contents of the overall Letter which were at least potentially foolish, were so accentuated in the edited version that they realized that potentiality. It is true that the original contained serious passages which were deleted

---

**13.** In *Stephen King*, King, the author of such best-selling horror thrillers as *The Shining* and *Carrie*, sued to prohibit use of his name "on or in connection with" the movie *The Lawnmower Man*, which drew in some material respects from a ten page short story written by him—he had no other involvement with the picture and did not approve the screenplay or the movie. King contended that use of his name in (i) a possessory credit, describing the movie as "Stephen King's The Lawnmower Man," and (ii) a "based upon" credit, representing that the movie was "based upon" a short story by King, falsely designated him as the originator of the motion picture. In its review of the district court's grant of a preliminary injunction, the Court of Appeals held that "the movie draws in sufficiently material respects on the Short Story in qualitative and quantitative aspects," *id.* 976 F.2d at 830, and thus the use of the "based upon" credit was justified; however, the court found the use of a possessory credit violated § 43(a) of the Lanham Act, *id.* at 829.

**14.** Rosenblatt testified that in his view Harper's edit changed the letter "a serious and sometimes moving and impressive piece of work, to something that looked ridiculous, made the author of the letter look ridiculous and clownish." (Tr. Rosenblatt 512). In his opinion, Harper's took what they found most newsworthy, without taking sufficient care to preserve the tone of the original.

In contrast, Honan testified:

Q: Mr. Rosenblatt testified yesterday that the original letter was a serious work whereas the edited version makes Mr. Lish look ridiculous. Do you see a dichotomy of that sort between the two versions?

A: No. I think that is absurd. I think this edit is a perfectly responsible condensation of the original. Mr. Rosenblatt is a very fine writer and occasional editor, I believe, and I have never met him either but I have a high regard for his work. But in this particular question that you ask me, I could not disagree more.

(Tr. Honan 739–740).

in the published version.[15] However, the original Letter also contained, as Lish himself admitted, "extravagant" passages (Tr. Lish 605). Without deciding whether an objective reader would have found that the original Letter itself made Lish look foolish, I find that the edited version did not heighten that possibility; that is to say, if there was foolishness in the original it was not unfairly accentuated in the edited version. In sum, the Letter as edited was not unrepresentative of the original Letter and therefore did not constitute false designation of origin.

This conclusion is fortified by the fact that the introduction to the Harper's' version specified that the material was "From an introductory letter sent last summer by Gordon Lish to students enrolled in his fall fiction-writing workshop," which both parties agree at the least signified that the Letter had been excerpted from its source and did not constitute the whole. Lish's argument that the use of the word "from" was insufficient to alert readers to the extent of the edit does not dictate a contrary conclusion. It may be that the absence of ellipses is an item that might tend to confuse the reader, however, the evidence is not decisive on this point.[16] More importantly, the bottom line is not the use or non-use of ellipses or the meaning of "from," it is whether the printed version departed so substantially from the original as to unfairly represent the original. As discussed above, I find that the version of the letter published in Harper's was representative of the original, and, accordingly, did not falsely designate its origin.

It follows that the Lanham Act claim is dismissed.

## DEFAMATION

 Lish asserts that by publishing the severely edited version of the Letter as Lish's original writing, Harper's defamed him. According to Lish, altering prose and sending up a garbled, lesser version of the work as the author's own, historically has been held to constitute libel *per se*.[17]

The cause of action for defamation is dismissed. As stated above, the published version of the Letter was representative of the original. Moreover, Lish has presented no evidence whatever of damage to his reputation and it is reasonable to conclude that a reputation such as his, which has been so secure to date, is impervious to the mere publication of the edited version.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

 Finally, Lish argues that by publishing the edited version of his letter, Harper's intentionally inflicted emotional distress on him.[18] To establish such a cause

---

**15.** For example: "Do not think there is no correspondence between the strength of your heart and the strength of your sentences." Letter at 2.

**16.** Rosenblatt testified:

Q: [I]s the word "From" in the introduction to a piece a substitute for the use of ellipses?
A: No. Again, not in my experience. "From" simply means that you have taken an extract from something and if you don't see ellipses, what you are getting is the whole deal, a contiguous whole rather than something that has been altered in any serious way.

(Tr. Rosenblatt 531). However, Pollan testified: The only guarantee in this business is the trust between editors or journalists and their readers, and we do it with the word "from," and our readers have come to trust us as cutting documents in a fair manner.

(Tr. Pollan 205). Moreover, Lish did not provide any objective evidence on this point.

**17.** The complaint puts it this way:

Defendant's dissemination and publication of the altered version of the Letter, in which significant, substantive, and inspirational sections have been deleted, together with defendant's false characterization of the altered version of the Letter as Mr. Lish's work, falsely, recklessly, and maliciously defames Mr. Lish both personally and professionally, in that he is thereby portrayed as a less competent teacher and a less inspired writer. (Compl. ¶ 47).

**18.** The complaint puts it this way:

Defendant, which was aware of Mr. Lish's concerns for the "confidentiality" and "strictly private" nature of the communications involving the private writing seminars, as set forth in the Letter itself, nevertheless published the altered version of the Letter, characterizing it as the work of Mr. Lish, even though significant substantive and inspirational sections had been deleted. These deliberate, willful

of action under New York law, which governs, a plaintiff must prove

> (1) an extreme and outrageous act by the defendant; (2) an intent to cause severe emotional distress; (3) resulting severe emotional distress; (4) caused by the defendant's conduct.

*Conniff v. Dodd, Mead & Co.*, 593 F.Supp. 266, 269 (S.D.N.Y.1984) (citing *Burba v. Rochester Gas and Electric Corp.*, 456 N.Y.S.2d 578, 579 (4th Dep't 1982)). The evidence altogether fails to establish the claim.

To begin with, there is no merit to Lish's claim that Harper's' conduct was "extreme and outrageous." Under New York law, extreme and outrageous conduct is conduct "which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349, 355 (1985). It would be a travesty to hold that Harper's' conduct was "atrocious and intolerable in a civilized society" under any circumstances, but the claim is utterly negated by the findings above that Harper's' conduct was not in bad faith and that the edited version of the Letter was representative of the original.

■ Moreover, Lish has failed to establish that Harper's acted with the requisite intent to cause him severe emotional distress. Harper's' witnesses have admitted that they knew the publication of the Letter would "upset" Lish and that they knew Lish "might get angry" (Tr. MacArthur 341). However, this was not "a deliberate and malicious campaign of harassment or intimidation." *Nader v. General Motors Corp.*, 25 N.Y.2d 560, 307 N.Y.S.2d 647, 654, 255 N.E.2d 765, 770 (1970). Mere awareness that publication of an article might annoy or embarrass the subject does not rise to an "intent to cause severe emotional distress."

> and malicious acts of defendant were designed by it and its agents and employees to cause Mr. Lish mental and emotional distress and ridicule. (Compl. ¶ 52).

19. The Copyright Act provides in certain circumstances for statutory damages and for attorney's fees. They are not allowable in this case,

■ Lish also appears to argue that the publication of lengthy excerpts from the Letter by itself constitutes intentional infliction of emotional distress because Harper's "was aware of Mr. Lish's concerns for the 'confidentiality' and 'strictly private' nature" of the class. (Compl. ¶ 52). However, to the extent that Lish's claim is that Harper's violated the privacy of his class, privacy is simply not an interest which the law of intentional infliction of emotional distress protects.

The cause of action for intentional infliction of emotional distress is dismissed.

## IV.

### DAMAGES

■ The sole damages to which Lish is entitled arise under the Copyright Act. § 504(b) provides that a successful plaintiff may recover "the actual damages suffered by him as a result of the infringement, and any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b).[19]

There are no profits attributable to the infringement. While Lish established the gross revenue of Harper's for the December 1990 issue, Harper's has proven by undisputed evidence that its "deductible expenses" substantially exceeded its "gross revenue" (see 17 U.S.C. § 504(b)), so that no profit was realized either for December 1990 or for the entire year (Defendant's Exhibits FH and FI).

As to actual damages, the parties agree that the calculation of actual damages should be based on the "market value" of the Letter (Tr. 811 and 844), but they disagree as to what that value is or how it is to be determined.

Harper's suggests that it should be valued at $250 or less. It proposes three "benchmarks" for determination of the value of the Letter:

> however, because Section 412 of the Act authorizes their payment (1) with respect to an unpublished work only if the unauthorized publication occurs after registration, and (2) with respect to a published work only if the registration occurs within three months of publication. Neither such condition has been met here.

1) The price Harper's ordinarily pays for material for the Readings section (19 cents per word according to Defendant's Exhibit IBA, for a total value of $229).

2) Payment at the average rate per word which Lish has received for his short stories and essays (10 cents a word according to Defendant's Exhibit IR, for a total of $120).

3) The highest amount which Harper's has actually paid to Lish for material previously appearing in the Readings section. According to Harper's' counsel, there were two such pieces which were purchased for $250 or less.

Lish, on the other hand, contends that he should be paid at least the rate of $2 a word, the amount he was recently offered to write a restaurant review for *FYI* magazine (Plaintiff's Exhibits 47 and 48). He argues that the fees which Harper's pays for "Readings" work are inapplicable because the "Readings" material is by and large made up of reprints. He relies also on the fact that Harper's paid him 75 cents a word for an article of his which it published in 1976.

It seems plain that there is no true "market value" for the Letter, and it cannot be said that any of the suggested approaches is economically more persuasive than another. Nevertheless, approaching the market value concept as closely as is possible under these artificial circumstances, Lish is awarded actual damages of $2,000.

\* \* \*

In sum, Harper's is found liable in the sum of $2,000 for violation of Lish's copyright of his letter and the remaining causes of action for false designation of origin, defamation and intentional infliction of emotional distress, are dismissed.

It is so ordered.

## ON RECONSIDERATION

Harper's Magazine Foundation moves for reconsideration and amendment of the Opinion and Order of this court of November 24, 1992 which found that Harper's had violated the copyright of Gordon Lish and awarded damages in the amount of $2,000. The motion is denied except that the award of damages of $2,000 is eliminated.

Harper's claims that a number of the court's rulings which resulted in a finding of copyright violation by Harper's were in error. It asserts that the court's analysis of factor one was incorrect; that the court double-counted factors two and three; that the court's finding that Harper's' use was commercial was in error and that the court erroneously analyzed a "proper fair use balancing".

In reply, Lish contends that the motion should be denied not only because the court's rulings were correct, but that Harper's has failed to meet the requirements of Rule 3(j) of the Civil Rules of this court, that a motion for reargument shall be based on "matters or controlling decisions which counsel believes the court has overlooked".

Harper's motion does not seem to meet the requirements of Rule 3(j). But putting aside that deficiency, its arguments that the court's determination of questions relating to liability were incorrect, are not persuasive. In any event, the remedy for Harper's in the circumstances is to appeal the decision.

As to damages, Harper's points out that the court found that "the Letter [the subject of the litigation] did not have 'commercial value' of itself in December 1990" and that, as to the future, "it is not plausible that a buyer who read the Letter in Harper's would be dissuaded from buying a book written by Mr. Lish on the teaching of writing simply because she had previously read the Letter". On this theory, it was held that Lish had failed, with regard to fair use factor four (the effect of the use upon the potential market for or value of a copyrighted work), to prove any effect on either the present value or future value of the Letter. In spite of this finding, the November 24, 1992 Opinion awarded Lish $2,000 actual damages as the "market value" of the Letter.

Harper's argues that the award of damages was inconsistent with the finding, as

to fair use factor four, that Harper's' publication of the Letter had no effect upon the Letter's potential market or value.

In response, Lish contends that the court's determination of Lish's actual damages precisely followed the rationale on the subject of damages articulated by Harper's' counsel in summation, and that Harper's is, accordingly, hoist by its own petard.

In fairness to Harper's counsel, the discussion of the subject at summation appears to have been based on the assumption, arguendo, that Lish suffered actual damages and counsel's statement was intended to present Harper's' views as to how damages should be calculated in such circumstances.

In any event, if an error in calculation of damages has been made, it should be corrected. While an argument may be made that, a finding that, for the purposes of determining fair use, a copyright violation has no effect upon the value of the copyrighted work, does not preclude an award of actual damages for the violation itself, nevertheless, such a rationale appears somewhat forced and, perhaps, inconsistent with the law of the Circuit as specified in *Business Trends Analysts v. Freedonia Group, Inc.*, 887 F.2d 399 (2d Cir.1989). In a case where, as here, the plaintiff copyrighted the subject of the litigation after the alleged violation occurred, the *Business Trends* court held that, under Section 504(b) of the statute, unless the plaintiff proved actual damages, he was entitled to no damages in spite of the copyright violation and in spite of the seeming inadequacy of such a damage scheme. As the court said at page 406:

> Although Section 504(b) may provide a conventional and narrow method of calculating damages and profit, the Copyright Act does not overlook the fact that this method, if the exclusive remedy, may lead to injustice and underenforcement of the copyright laws.

Accordingly, the court's Opinion and Order of November 24, 1992 is amended by striking the award of damages in the amount of $2,000 and is otherwise denied.

It is so ordered.

EXHIBIT A

It is absolutely unacceptable to me that this term not prove to be our most heroic yet. Everything points to the gathering in amazements, not least the urgency that has entered so many of our lives. Add to the list Robin Chmelar, who—as with Ted Pejovich—has been undergoing the harshest difficulties and must as a result, come to us a day or so late this term (late for the Tuesday class, that is, to which class she now belongs, but perhaps on time for the first Thursday class), given that the Mayo Clinic will be preempting her attention. So be it. The world of actual events, as that fellow in Iraq is demonstrating, will press at us with ever more aggressive insult. Lucky, indeed, are those who have taken, are taking, steps to establish a circle inside of which one might secure to oneself a certain sanctuary in the company of the timeless, the transcendent. Happy news comes to me from Louisa Ermelino, whose first novel has been placed with St. Martin's, and from Jennifer Allen, Patricia Lear, and Amy Hempel (conferences where they had the deserved pleasure of disporting themselves as hotshots). The same goes for Diane Williams, who, at Bard College, undertook this summer her first teaching assignment. The Dallas Morning News compared Williams' This Is About the Body, etc., with the work of Kafka, of Barthelme: and Grove now plans to bring out a softcover edition. It happens that a number of oldtimers are (if only quondam) teachers of fiction-writing now—by my quick count Yannick Murphy, Peter Christopher, Mark Richard (newly confirmed pal of, ye gods, Jackie O.), Jennifer Allen, Ted Pejovich, Amy Hempel, and Diane Williams, and there is, of course, a goodish group who had already been teaching fiction-writing when they first came to me. Anyway, all the more reason why the source of their "anxiety of influence" must again redouble his efforts if he is to keep surpassing himself, a requirement, you have my word, he pledges himself to meet. The first proof of this warrant will be before you in a month's time. As to preparing oneself for which event, newcomers

are invited to hear the ensuing sentences, yes? Please know that you are asked to bring nothing to our meetings save all your heart and all your mind. You will notice that some persons trouble themselves to note down everything I say; others only the odd assertion; some persons not one blessed word. Do as you like, but do *not* attempt to tape-record. In like concern, know that these classes are strictly private. Anything said in the course of an evening, by me or by your colleagues, must be considered our sovereign property and not the business of anyone exterior to us, most especially anyone officially, or even unofficially, a journalist. To violate the confidentiality of the class is to dishonor yourself irreparably—and, further, to expose yourself to the lifelong contempt of those who took you to be a citizen of the humane arts. Newcomers could not possibly know how arduous, how taxing an experience awaits them. Much is going to be asked of you— and altogether aptly, necessarily—for the profit that can come to you from these classes is great beyond measure. If you cannot meet the basal test of decent relations with those who travel this distance with you, then resign now—because much, much more than the merely basal is going to be expected of you, else there can be no learning in the grand degree that is the justification for the fame of these classes. There are oldtimers who have been with me for years—for as far back as Columbia and NYU, even, in a recent probable instance (if he can make his way up from Texas), from as long ago, in my years, as Yale. Keep your eye on these persons; let their discipline be an instruction to you. Do not think that there is no correspondence between the strength of your heart and the strength of your sentences. These classes are about acquiring power on the page. Surely such power arises from every strategy conceivably within the reach of writing—but just as surely such power has its beginning in the character of one's nature as a spiritual enterprise. In other words, boys and girls, be nice, be of clean heart and high mind. But if you cannot be, beat

it—now. Because you are on the point of taking your place in an undertaking not anything like what you have ever before essayed—this you can depend on! It is, in the opinion of some, a kind of magnificence, this class—and it confers, many claim, a kind of magnificence upon those who have managed to make their way from start to finish. Swell. Let the magificence get a headstart in you by reason of your getting your head, as the expression goes, in the right place right this very instant. The class is *not* in any wise like any class you have ever been a member of. This necessarily means that it would be a grievous mistake for you to bring to the class a set of assumptions and anticipations colored by experience. Your experience does not apply; your experience is a hindrance. Instead, keep your head wide-open for brand-new business. The more you arouse in yourself the expectation of the exceptional, the more you will free yourself from the liability of habit. On the point of the practical, classes begin—I say now for the third time—on 18 and on 20 September. If you are uncertain which class is your class, call me at 212 572 2128. There are, I remind you, twelve meetings, each beginning at six sharp and ending no earlier, sometimes later, than midnight. You realize that we do not meet Thanksgiving week. The Tuesday class convenes at Christine Schutt's (51 East 90, 860–0583); the Thursday class at Sally Turner's (1112 Park, 348–0231), sites within a half-block of one another. Newcomers understand that you are invited to sit in on the opposing class if you must miss a meeting of your class. Respecting the out-of-towners who are moving to NYC for the duration and who have been told that they are welcome to visit the Tuesday class, check with me before you begin to do this, inasmuch as a premature serving of what gets dished out in the Tuesday class could be too much for you to swallow hygienically. Your aim is to learn; the more orderly the procedure by which you attempt to do this, the more likely learning will happen. A caution: Quite apart from the Tuesday class' pursuing its program in accordance with a differ-

ent sequence of progress and with distinct materials, no few of these materials contradict or, at least, are greatly at variance with, the subject matter in the Thursday class. Do not risk confusion unless it seems desirable to risk it. Out-of-towners should know that the classes are conducted in one of the better neighborhoods—but, of course, New York is New York. Given the widening disruption evident in street life everywhere in the United States, it is perhaps foolish to make a special case in discussing commonsensical precautions for persons coming to NYC from, say, New Mexico, as Dan Callis is, or from Ontario, Canada, as Geoffrey Brown is. Fear not, or at least not excessively. We buddy-up, as a usual course, while making our way home, despite the loveliness (hah!—at that hour of the night!) of the neighborhood we will be taking ourselves home from. Well, there has never been a casualty yet—please God the Evil Eye was not watching the formation of that cheeky sentence! Sometime in the course of the first Thursday class someone (Mary Busch?—you are designated, Mary), at an appropriate late hour, will please remind me to remark taxi-sharing and the like. On this point, by the bye: no questions, not during the course of the class. If you have a question whose content is just too burdensome for you to shlepp it home, ask your question after class. Ditto, please understand, the making of observations. Meaning, people are paying an exorbitant fee and, in certain instances, even more exorbitant costs for the business of traveling to us and taking digs. These expenditures are embraced for the purpose of one's being present for the teacher's teaching—and for solely this. Please believe that your question will very likely be superannuated by statements I will, when the occasion properly calls for it, make. I have been teaching fiction-writing for thirty years. I know how to do my job. I need no one's help in doing it. Not to fret: You will have the chance to show off every inch of your knowing by virtue of the literary artifacts you will be creating from it. Unlike normative schooling structures, here is a setting where the teacher does not seek the occasion to kill time, nor does he invite the provocation to be led off his course. Learning, acquiring a new set of behaviors, is a monstrously challenging task: everything must be made to abet its happening. Therefore: no questions, no interruptions. Sit. Listen. If there is a point on which you are unclear, contain yourself—for clarity will very likely come to you if you really want for it to come. Attend to what I am saying. Do this as best you are able (you will, mark me, get better and better as it) and you will surely observe my doubling back and doubling back and, each time that I do so, my bringing greater and greater exposition and exactitude to everything that has already been said—so that I might heighten the force of your revelations and elevate them to more sophisticated (read "ironic") terms. Please make the most unbreachable contract with yourself to be present for class right on the stroke of the clock; as oldtimers will tell you, the first hour or two often find me at the zenith of my inspiration and usefulness—as does the last hour. Gigantic good can come to you that might otherwise not—if you are not there. Being there, just being there—there is genius in this—as Patricia Lear, who comes to us from Kenilworth, Illinois, was the first to suggest. You know, the outward sign and so forth ... At all events, I know how much of a hardship it is for some of you to make your way to class—from such distances, in every species of weather, with every personal distraction and interference. But think of Hob Broun—one lousy, stinking letter at a time—sipping air and then puffing it back—sipping and sipping and puffing and puffing. Think of Broun and then, by thunder, do your damnedest—for yourself. Christine's place, Sally's place, it goes without saying that they must, when we have gone away from them, exhibit no evidence that we have ever been in them. Please to take particular pains to police the locus where you stuck your yourself down to sit away the hours. No snippets, no jibbie-jibbies left behind you, yes? Please to remember that Robin Chmelar must

have the seat nearest the potty and that Thomas Currier <u>must</u> have a seat, period. Please do not imitate Currier's standing from time to time—he does so for medical necessity. Yes, yes, you may, of course, use the potty—but watch Gordon and ask yourself, does he? Well, as you wish, as you wish—but please wish to see that there is much to be said *for demanding of your-self* that <u>outward sign</u> and discovering that, my God, you *can* exhibit it, as witness the literary marvels to issue from Peter Christopher and from others who have shown themselves able to practice an olympian restraint. Ditto for things one might nibble, might sip. Do it if you wish—but, again, look around you and see: does Lish? And since, reduced to its simplest formulation, the goal of your labors should be to overtake Lish ... Well, the inference is yours to draw, yes? On the other hand, who would dare to deny that it was her big bottle of water that made the crucial moral difference for Jennifer Allen? Look, do as you must—but be willing to wonder, perhaps for the first time, <u>what you really must</u>. A further word on courtesies to be paid to Christine and Sally: the lobbies of their buildings, weather permitting, will be best used if kept empty of us when we are waiting around for the starting bell or, after midnight, are up to our routine lolly-gagging. (Are newcomers surprised to hear that people actually want to hang around after their having already logged in <u>six</u> or more <u>hours</u> of such activity? Just wait!) At any rate, be willing to appreciate the wonderfully hospitable conditions offered by the sidewalk on either side of 90th Street between Madison and Park. Okay, that's it and that's it—save for me to say please be thrilled for what you are about to do. It is a brave prospect, incommensurate with the ordinary acts of your life and potentially susceptible of raising up from you nothing less than the occult, the strange, the unprecedented, the unexam-pled, the fabulous—namely, a work of art, an artifact worthy of history's notice. Old-timers know that I will stop at nothing to manage this immense ambition. To be sure, I feel more robust than ever, having at last shipped off to Borchardt the novel I had been failing to wrestle into the harness these last cruel years. I am stronger for that accomplishment, all the stronger to lift you up and carry you over the top—if you will only let yourself be lifted and carried. Listen to me—whatever your life is, there can be an excellence in it, a garden of achievement that no jealous god can drive you out of and whose walkways, however narrow, can keep you safe and steady on your course for all the rest of your given days. Soon, then—and be well, GORDON

EXHIBIT B

[Letter]

# A KIND OF MAGNIFICENCE

*From an introductory letter sent last summer by Gordon Lish to students enrolled in his fall fiction-writing workshop. Students pay $2,400 each to attend twelve weekly sessions, which are held in Manhattan apartments. Lish is the editor of* The Quarterly, *an editor at Knopf, and the author of several novels.*

It is absolutely unacceptable to me that this term not prove to be our most heroic yet. Everything points to the gathering in of amazements. Happy news comes to me from Louisa Ermelino, whose first novel has been placed with St. Martin's, and from Jennifer Allen, Patricia Lear, and Amy Hempel. It happens that a number of old-timers are (*if only quondam*) teachers of fiction writing now—by my quick count, Yannick Murphy, Peter Christopher, Mark Richard (newly confirmed pal of, ye gods, Jackie O.), Jennifer Allen, Ted Pejovich, Amy Hempel, and Diane Williams. Anyway, all the more reason why the source of their "anxiety of influence" must again redouble his efforts if he is to keep surpassing himself, a requirement, you have my word, he pledges himself to meet.

Newcomers could not possibly know how arduous, how taxing an experience awaits them. Much is going to be asked of you—and altogether aptly, necessarily—for the profit that can come to you from these classes is great beyond measure. If you cannot meet the basal test of decent relations with those who travel this distance with you, then resign now—because much, much more than the merely basal is going to be expected of you, else there can be no learning in the grand degree that is the justification for the fame of these classes. In other words, boys and girls, be nice, be of clean heart and high mind. But if you cannot be, beat it—*now*. Because you are on the point of taking your place in an undertaking not anything like what you have ever before essayed—this you can depend on! It is, in the opinion of some, a kind of magnificence, this class—and it confers, many claim, a kind of magnificence upon those who have managed to make their way from start to finish. Swell. On the point of the practical, classes begin on 18 and 20 September. There are, I remind you, twelve meetings, each beginning at six sharp and ending no earlier, sometimes later, than midnight. The Tuesday class convenes at Christine S.'s; the Thursday class at Sally T.'s, sites within a half-block of each other. Sometime in the course of the first Thursday class someone (Mary B.?—you are designated, Mary), at an appropriate late hour, will please remind me to remark on taxi sharing and the like. On this point, by the bye: *no questions*, not during the course of the class. If you have a question whose content is just too burdensome for you to schlepp home, ask your question *after* class. Ditto, please understand, the making of observations. Meaning, people are paying an exorbitant fee and, in certain instances, even more exorbitant costs for the business of traveling to us and taking digs. These expenditures are embraced for the purpose of one's being present for the teacher's teaching—and for solely this. Please believe that your question will very likely be superannuated by statements I will, when the occasion properly calls for it, make. I have been teaching fiction writing for thirty years. *I know how to do my job. I need no one's help in doing it.* Not to fret: You will have the chance to show off every inch of your knowing by virtue of the literary artifacts you will be creating from it. Learning, acquiring a new set of behaviors, is a monstrously challenging task: Everything must be made to abet its happening. Therefore: *no questions, no interruptions.* Sit. Listen. Do this as best you are able (you will, mark me, get better and better at it) and you will surely observe my doubling back and doubling back and, each time that I do so, my bringing greater and greater exposition and

exactitude to everything that has already been said—so that I might heighten the force of your revelations and elevate them to more sophisticated (read "ironic") terms. Please make the most unbreachable contract with yourself to be present for class right on the stroke of the clock; as old-timers will tell you, the first hour or two often find me at the zenith of my inspiration and usefulness—as does the last hour. Gigantic good can come to you that might otherwise not—if you are not there. Christine's place, Sally's place, it goes without saying that they must, when we have gone away from them, exhibit no evidence that we had ever been in them. Please to take particular pains to police the locus where you stuck yourself down to sit away the hours. No snippets, no jibbie-jibbies left behind you, yes? Yes, yes, you may, of course, use the potty—but watch Gordon and ask yourself, does he? Well, as you wish, as you wish—but please wish to see that there is much to be said for demanding of yourself that *outward sign* and discovering that, my God, you *can* exhibit it, as witness the literary marvels to issue from Peter Christopher and from others who have shown themselves able to practice an Olympian restraint. Ditto for things one might nibble, might sip. Do it if you wish—but, again, look around you and see: Does Lish? And since, reduced to its simplest formulation, the goal of your labors should be to overtake Lish . . . Well, the inference is yours to draw, yes? On the other hand, who would dare to deny that it was her big bottle of water that made the crucial moral difference to Jennifer Allen? Look, do as you must—but be willing to wonder, perhaps for the first time, *what you really must.* A further word

*"Habla español?"*

From In Health, *published in Sausalito, California.*

on courtesies to be paid to Christine and Sally: The lobbies of their buildings will be best used if kept empty of us when we are waiting around for the starting bell or, after midnight, are up to our routine lollygagging. (Are newcomers surprised to hear that people actually want to hang around after their having already logged in six or more *hours* of such activity? Just wait!) Okay, that's it and that's it—save for me to say please be thrilled for what you are about to do. It is a brave prospect, incommensurate with the ordinary acts of your life and potentially susceptible of raising up from you nothing less than the occult, the strange, the unprecedented, the unexampled, the fabulous—namely, a work of art, an artifact worthy of history's notice. Old-timers know that I will stop at nothing to manage this immense ambition. To be sure, I feel more robust than ever, having at last shipped off the novel I had been failing to wrestle into the harness these last cruel years. I am stronger for that accomplishment, all the stronger to lift you up and carry you over the top—if you will only let yourself be lifted and carried. Listen to me—whatever your life is, there can be an excellence in it, a garden of achievement that no jealous god can drive you out of and whose walkways, however narrow, can keep you safe and steady on your course for all the rest of your given days. Soon, then, and be well—GORDON

### EXHIBIT C

It is absolutely unacceptable to me that this term not prove to be our most heroic yet. Everything points to the gathering in of amazements. Happy news comes to me from Louisa Ermelino, whose first novel has been placed with St. Martin's, and from Jennifer Allen, Patricia Lear, and Amy Hempel. It happens that a number of old-timers are (if only quondam) teachers of fiction writing now—by my quick count, Yannick Murphy, Peter Christopher, Mark Richard (newly confirmed pal of, ye gods, Jackie O.), Jennifer Allen, Ted Pejovich, Amy Hempel, and Diane Williams. Anyway, all the more reason why the source of their "anxiety of influence" must again redouble his efforts if he is to keep surpassing himself, a requirement, you have my word, he pledges himself to meet. Newcomers could not possibly know how arduous, how taxing an experience awaits them. Much is going to be asked of you—and altogether aptly, necessarily—for the profit that can come to you from these classes is great beyond measure. If you cannot meet the basal test of decent relations with those who travel this distance with you, then resign now—because much, much more than the merely basal is going to be expected of you, else there can be no learning in the grand degree that is the justification for the fame of these classes. In other words, boys and girls, be nice, be of clean heart and high mind. But if you cannot be, beat it—now. Because you are on the point of taking your place in an undertaking not anything like what you have ever before essayed—this you can depend on! It is, in the opinion of some, a kind of magnificence, this class—and it confers, many claim, a kind of magnificence upon those who have managed to make their way from start to finish. Swell. On this point, by the bye: no questions, not during the course of the class. If you have a question whose content is just too burdensome for you to schlepp home, ask your question *after* class. Ditto, please understand, the making of observations. Please believe that your question will very likely be superannuated by statements I will, when the occasion properly calls for it, make. I have been teaching fiction writing for thirty years. I know how to do my job. I need no one's help in doing it. Not to fret: You will have the chance to show off every inch of your knowing by virtue of the literary artifacts you will be creating from it. As old-timers will tell you, the first hour or two often find me at the zenith of my inspiration and usefulness—as does the last hour. Gigantic good can come to you that might otherwise not—if you are not there. Yes, yes, you may, of course, use the potty—but watch Gordon and ask yourself, does he? Well, as you wish, as you wish—but please wish to see that there is much to be said for demanding of yourself that *outward* sign and discovering that, my God, you *can* exhibit it, as witness the literary marvels to issue from Peter Christopher and from others who have shown themselves able to practice an Olympian restraint. (Are newcomers surprised to hear that people actually want to hang around after their having already logged in

six or more <u>hours</u> of such activity? Just wait!) Okay, that's it and that's it—save for me to say please be thrilled for what you are about to do. It is a brave prospect, incommensurate with the ordinary acts of life and potentially susceptible of raising up from you nothing less than the occult the strange, the unprecedented, the unexampled, the fabulous—namely, a work of art, an artifact worthy of history's notice. Listen to me—whatever your life is, there can be an excellence in it, a garden of achievement that no jealous god can drive you out of and whose walkways, however narrow, can keep you safe and steady on your course for all the rest of your given days. Soon, then, and be well—GORDON.